# PATTERSON *v.* McLEAN CREDIT UNION

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 87–107.   Argued February 29, 1988—Reargued October 12, 1988—Decided June 15, 1989

*Julius LeVonne Chambers* reargued the cause for petitioner. *Penda D. Hair* argued the cause for petitioner on the original argument. With them on the briefs were *Charles Stephen Ralston, Gail J. Wright, Eric Schnapper, Ronald L. Ellis, Harold L. Kennedy III,* and *Harvey L. Kennedy.*

*Roger S. Kaplan* reargued the cause for respondent. *H. Lee Davis, Jr.,* argued the cause for respondent on the original argument. With them on the briefs were *George E. Doughton, Jr., Anthony H. Atlas, Gary R. Kessler,* and *Earl M. Maltz.\**

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Solicitor General Ayer, Deputy Assistant Attorney General Clegg, Glen D. Nager,* and *Jessica Dunsay Silver;* and for the American Civil Liberties Union Foundation et al. by *Steven R. Shapiro, John A. Powell, Helen Hershkoff,* and *Adam Stein.*

*Robert E. Williams, Douglas S. McDowell,* and *Lorence L. Kessler* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for 66 Members of the United States Senate et al. by *John H. Pickering, Timothy B. Dyk, James E. Coleman, Jr., John Payton, Kerry W. Kircher, Edward H. Levi, Laurence H. Tribe,* and *William L. Taylor;* for the State of New York et al. by *Robert Abrams,* Attorney General of New York, *O. Peter Sherwood,* Solicitor General, *Suzanne M. Lynn* and *Sanford M. Cohen,* Assistant Attorneys General, *James M. Shannon,* Attorney General of Massachusetts, *Barbara B. Dickey* and *Douglas T. Shwarz,* Assistant Attorneys General, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Robert M. Spire,* Attorney General of Nebraska, *Dave Frohnmayer,* Attorney General of Oregon, *T. Travis Medlock,* Attorney General of South Carolina, *W. J. Michael Cody,* Attorney General of Tennessee, *Don Siegelman,* Attorney General of Alabama, *Grace Berg Schaible,* Attorney General of Alaska, *John Steven Clark,* Attorney General of Arkansas, *John K. Van*

JUSTICE KENNEDY delivered the opinion of the Court.

In this case, we consider important issues respecting the meaning and coverage of one of our oldest civil rights statutes, 42 U. S. C. § 1981.

de Kamp, Attorney General of California, *Duane Woodard*, Attorney General of Colorado, *Joseph Lieberman*, Attorney General of Connecticut, *Charles M. Oberly*, Attorney General of Delaware, *Robert Butterworth*, Attorney General of Florida, *Michael J. Bowers*, Attorney General of Georgia, *Warren Price III*, Attorney General of Hawaii, *Jim Jones*, Attorney General of Idaho, *Neil F. Hartigan*, Attorney General of Illinois, *Linley E. Pearson*, Attorney General of Indiana, *Thomas J. Miller*, Attorney General of Iowa, *Robert T. Stephan*, Attorney General of Kansas, *Frederick J. Cowan*, Attorney General of Kentucky, *William J. Guste, Jr.*, Attorney General of Louisiana, *James E. Tierney*, Attorney General of Maine, *J. Joseph Curran, Jr.*, Attorney General of Maryland, *Frank J. Kelley*, Attorney General of Michigan, *Michael C. Moore*, Attorney General of Mississippi, *William L. Webster*, Attorney General of Missouri, *Mike Greely*, Attorney General of Montana, *Brian McKay*, Attorney General of Nevada, *Stephen E. Merrill*, Attorney General of New Hampshire, *Cary Edwards*, Attorney General of New Jersey, *Lacy H. Thornburg*, Attorney General of North Carolina, *Nicholas Spaeth*, Attorney General of North Dakota, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Robert Henry*, Attorney General of Oklahoma, *LeRoy S. Zimmerman*, Attorney General of Pennsylvania, *James E. O'Neil*, Attorney General of Rhode Island, *Roger A. Tellinghuisen*, Attorney General of South Dakota, *Jim Mattox*, Attorney General of Texas, *Jeffrey Amestoy*, Attorney General of Vermont, *Mary Sue Terry*, Attorney General of Virginia, *Kenneth O. Eikenberry*, Attorney General of Washington, *Charles G. Brown*, Attorney General of West Virginia, *Don Hanaway*, Attorney General of Wisconsin, *Joseph B. Meyer*, Attorney General of Wyoming, *Godfrey R. deCastro*, Acting Attorney General of the Virgin Islands, *Frederick D. Cooke*, Corporation Counsel of the District of Columbia, *Hector Rivera-Cruz*, Attorney General of Puerto Rico, and *Elizabeth Barrett-Anderson*, Attorney General of Guam; for the American Bar Association by *Robert MacCrate, William H. Allen,* and *Mitchell F. Dolin;* for the American Jewish Congress et al. by *Marvin E. Frankel* and *Marc D. Stern;* for the Association of the Bar of the City of New York et al. by *Jonathan Lang, Howard J. Aibel,* and *Charles S. Sims;* for the Center for Civil Rights by *Clint Bolick, Jerald L. Hill,* and *Mark J. Bredemeier;* for the Center for Constitutional Rights et al. by *Esmeralda Simmons, Arthur Kinoy, Frank E. Deale,* and *Wilhelm Joseph;* for the Lawyers'

# I

Petitioner Brenda Patterson, a black woman, was employed by respondent McLean Credit Union as a teller and a file coordinator, commencing in May 1972. In July 1982, she was laid off. After the termination, petitioner commenced this action in the United States District Court for the Middle District of North Carolina. She alleged that respondent, in violation of 14 Stat. 27, 42 U. S. C. § 1981, had harassed her, failed to promote her to an intermediate accounting clerk position, and then discharged her, all because of her race. Petitioner also claimed this conduct amounted to an intentional infliction of emotional distress, actionable under North Carolina tort law.

The District Court determined that a claim for racial harassment is not actionable under § 1981 and declined to sub-

Committee for Civil Rights Under Law by *Thomas D. Barr, Robert F. Mullen, Conrad K. Harper, Stuart J. Land, Norman Redlich, William L. Robinson, Judith A. Winston, Richard T. Seymour, Stephen L Spitz, Albert E. Arent, Thomas I. Atkins,* St. *John Barrett, Wiley A. Branton,* Sr., *Paul A. Brest, David R. Brink, William H. Brown III, Ramsey Clark, Jerome A. Cooper, Michael A. Cooper, Lloyd N. Cutler, James T. Danaher, Drew S. Days III, Armand Derfner, Paul R. Dimond, John W. Douglas, Victor M. Earle III, Robert Ehrenbard, Fred N. Fishman, Mac-Donald Flinn, Laurence S. Fordham, Eleanor M. Fox, John D. French, Lloyd K. Garrison, A. Spencer Gilbert III, Joan Hall, Herbert J. Hansell, John B. Jones, Stuart L. Kadison, Robert H. Kapp, Nicholas deB. Katzenbach, Robert M. Landis, Jerome B. Libin, John V. Lindsay, Hans F. Loeser, Henry L. Marsh III, Robert W. Meserve, Robert B. McKay, Peter P. Mullen, Robert A. Murphy, John E. Nolan, Jr., Kenneth Penegar, Charles S. Rhyne, Elliot L. Richardson, James Robertson, Mitchell Rogovin, Edwin A. Rothschild, Stephen H. Sachs, Bernard G. Segal, Jerome G. Shapiro, Jerome J. Shestack, Asa D. Sokolow, Chesterfield Smith, David S. Tatel, Randolph W. Thrower, John E. Tobin, Michael Traynor, Marna S. Tucker, Harold R. Tyler, Jr., Herbert M. Wachtell,* and *Howard P. Willens;* for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Paul D. Kamenar;* for *J. Philip Anderegg,* pro se; for Carol L. Bisharat et al. by *Eva Jefferson Paterson, Nathaniel Colley, William C. McNeill III,* and *Robert L. Harris;* for Curtis McCrary et al. by *Gary T. Brown;* and for Eric Foner et al. by *Richard D. Parsons.*

mit that part of the case to the jury. The jury did receive
and deliberate upon petitioner's § 1981 claims based on al-
leged discrimination in her discharge and the failure to pro-
mote her, and it found for respondent on both claims. As for
petitioner's state-law claim, the District Court directed a
verdict for respondent on the ground that the employer's con-
duct did not rise to the level of outrageousness required to
state a claim for intentional infliction of emotional distress
under applicable standards of North Carolina law.

In the Court of Appeals, petitioner raised two matters
which are relevant here. First, she challenged the District
Court's refusal to submit to the jury her § 1981 claim based
on racial harassment. Second, she argued that the District
Court erred in instructing the jury that in order to prevail
on her § 1981 claim of discriminatory failure to promote,
she must show that she was better qualified than the white
employee who she alleges was promoted in her stead. The
Court of Appeals affirmed. 805 F. 2d 1143 (1986). On th
racial harassment issue, the court held that, while instances
of racial harassment "may implicate the terms and conditions
of employment under Title VII [of the Civil Rights Act of
1964, 78 Stat. 253, 42 U. S. C. § 2000e et seq.] and of course
may be probative of the discriminatory intent required to be
shown in a § 1981 action," id., at 1145 (citation omitted), ra-
cial harassment itself is not cognizable under § 1981 because
"racial harassment does not abridge the right to 'make' and
'enforce' contracts," id., at 1146. On the jury instruction
issue, the court held that once respondent had advanced su-
perior qualification as a legitimate nondiscriminatory reason
for its promotion decision, petitioner had the burden of per-
suasion to show that respondent's justification was a pretext
and that she was better qualified than the employee who was
chosen for the job. Id., at 1147.

We granted certiorari to decide whether petitioner's claim
of racial harassment in her employment is actionable under
§ 1981, and whether the jury instruction given by the Dis-

trict Court on petitioner's § 1981 promotion claim was error. 484 U. S. 814 (1987). After oral argument on these issues, we requested the parties to brief and argue an additional question:

> "Whether or not the interpretation of 42 U. S. C. § 1981 adopted by this Court in *Runyon* v. *McCrary*, 427 U. S. 160 (1976), should be reconsidered." *Patterson* v. *McLean Credit Union*, 485 U. S. 617 (1988).

We now decline to overrule our decision in *Runyon* v. *McCrary*, 427 U. S. 160 (1976). We hold further that racial harassment relating to the conditions of employment is not actionable under § 1981 because that provision does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations. Finally, we hold that the District Court erred in instructing the jury regarding petitioner's burden in proving her discriminatory promotion claim.

## II

In *Runyon*, the Court considered whether § 1981 prohibits private schools from excluding children who are qualified for admission, solely on the basis of race. We held that § 1981 did prohibit such conduct, noting that it was already well established in prior decisions that § 1981 "prohibits racial discrimination in the making and enforcement of private contracts." *Id.*, at 168, citing *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 459–460 (1975); *Tillman* v. *Wheaton-Haven Recreation Assn., Inc.*, 410 U. S. 431, 439–440 (1973). The arguments about whether *Runyon* was decided correctly in light of the language and history of the statute were examined and discussed with great care in our decision. It was recognized at the time that a strong case could be made for the view that the statute does not reach private conduct, see 427 U. S., at 186 (Powell, J., concurring); *id.*, at 189 (STEVENS, J., concurring); *id.*, at 192 (WHITE, J., dissenting), but that view did not prevail. Some Members of

this Court believe that *Runyon* was decided incorrectly, and others consider it correct on its own footing, but the question before us is whether it ought now to be overturned. We conclude after reargument that *Runyon* should not be overruled, and we now reaffirm that § 1981 prohibits racial discrimination in the making and enforcement of private contracts.

The Court has said often and with great emphasis that "the doctrine of *stare decisis* is of fundamental importance to the rule of law." *Welch* v. *Texas Dept. of Highways and Public Transportation*, 483 U. S. 468, 494 (1987). Although we have cautioned that "*stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision," *Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S. 235, 241 (1970), it is indisputable that *stare decisis* is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon "an arbitrary discretion." The Federalist, No. 78, p. 490 (H. Lodge ed. 1888) (A. Hamilton). See also *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986) (*stare decisis* ensures that "the law will not merely change erratically" and "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals").

Our precedents are not sacrosanct, for we have overruled prior decisions where the necessity and propriety of doing so has been established. See *Patterson* v. *McLean Credit Union, supra*, at 617–618 (citing cases). Nonetheless, we have held that "any departure from the doctrine of *stare decisis* demands special justification." *Arizona* v. *Rumsey*, 467 U. S. 203, 212 (1984). We have said also that the burden borne by the party advocating the abandonment of an established precedent is greater where the Court is asked to overrule a point of statutory construction. Considerations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated,

and Congress remains free to alter what we have done. See, *e. g., Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*, 476 U. S. 409, 424 (1986); *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720, 736 (1977).

We conclude, upon direct consideration of the issue, that no special justification has been shown for overruling *Runyon*. In cases where statutory precedents have been overruled, the primary reason for the Court's shift in position has been the intervening development of the law, through either the growth of judicial doctrine or further action taken by Congress. Where such changes have removed or weakened the conceptual underpinnings from the prior decision, see, *e. g., Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 480–481 (1989); *Andrews* v. *Louisville & Nashville R. Co.*, 406 U. S. 320, 322–323 (1972), or where the later law has rendered the decision irreconcilable with competing legal doctrines or policies, see, *e. g., Braden* v. *30th Judicial Circuit Ct. of Ky.*, 410 U. S. 484, 497–499 (1973); *Construction Laborers* v. *Curry*, 371 U. S. 542, 552 (1963), the Court has not hesitated to overrule an earlier decision. Our decision in *Runyon* has not been undermined by subsequent changes or development in the law.

Another traditional justification for overruling a prior case is that a precedent may be a positive detriment to coherence and consistency in the law, either because of inherent confusion created by an unworkable decision, see, *e. g., Continental T. V., Inc.* v. *GTE Sylvania, Inc.*, 433 U. S. 36, 47–48 (1977); *Swift & Co.* v. *Wickham*, 382 U. S. 111, 124–125 (1965), or because the decision poses a direct obstacle to the realization of important objectives embodied in other laws, see, *e. g., Rodriguez de Quijas, supra*, at 484; *Boys Markets, Inc.* v. *Retail Clerks, supra*, at 240–241. In this regard, we do not find *Runyon* to be unworkable or confusing. Respondent and various *amici* have urged that *Runyon*'s interpretation of § 1981, as applied to contracts of employment, frustrates the objectives of Title VII. The argument is that

a substantial overlap in coverage between the two statutes, given the considerable differences in their remedial schemes, undermines Congress' detailed efforts in Title VII to resolve disputes about racial discrimination in private employment through conciliation rather than litigation as an initial matter. After examining the point with care, however, we believe that a sound construction of the language of § 1981 yields an interpretation which does not frustrate the congressional objectives in Title VII to any significant degree. See Part III, *infra.*

Finally, it has sometimes been said that a precedent becomes more vulnerable as it becomes outdated and after being "'tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare.'" *Runyon*, 427 U. S., at 191 (STEVENS, J., concurring), quoting B. Cardozo, The Nature of the Judicial Process 149 (1921). Whatever the effect of this consideration may be in statutory cases, it offers no support for overruling *Runyon.* In recent decades, state and federal legislation has been enacted to prohibit private racial discrimination in many aspects of our society. Whether *Runyon*'s interpretation of § 1981 as prohibiting racial discrimination in the making and enforcement of private contracts is right or wrong as an original matter, it is certain that it is not inconsistent with the prevailing sense of justice in this country. To the contrary, *Runyon* is entirely consistent with our society's deep commitment to the eradication of discrimination based on a person's race or the color of his or her skin. See *Bob Jones University* v. *United States*, 461 U. S. 574, 593 (1983) ("[E]very pronouncement of this Court and myriad Acts of Congress and Executive Orders attest a firm national policy to prohibit racial segregation and discrimination"); see also *Brown* v. *Board of Education*, 347 U. S. 483 (1954); *Plessy* v. *Ferguson*, 163 U. S. 537, 559 (1896) (Harlan, J., dissenting) ("The law regards man as man, and takes no account of his . . .

color when his civil rights as guaranteed by the supreme law of the land are involved").[1]

We decline to overrule *Runyon* and acknowledge that its holding remains the governing law in this area.

## III

Our conclusion that we should adhere to our decision in *Runyon* that § 1981 applies to private conduct is not enough to decide this case. We must decide also whether the con-

---

[1] JUSTICE BRENNAN chides us for ignoring what he considers "two very obvious reasons" for adhering to *Runyon*. *Post*, at 191. First, he argues at length that *Runyon* was correct as an initial matter. See *post*, at 191–199. As we have said, however, see *supra*, at 171–172, it is unnecessary for us to address this issue because we agree that, whether or not *Runyon* was correct as an initial matter, there is no special justification for departing here from the rule of *stare decisis*.

JUSTICE BRENNAN objects also to the fact that our *stare decisis* analysis places no reliance on the fact that Congress itself has not overturned the interpretation of § 1981 contained in *Runyon*, and in effect has ratified our decision in that case. See *post*, at 200–205. This is no oversight on our part. As we reaffirm today, considerations of *stare decisis* have added force in statutory cases because Congress may alter what we have done by amending the statute. In constitutional cases, by contrast, Congress lacks this option, and an incorrect or outdated precedent may be overturned only by our own reconsideration or by constitutional amendment. See *supra*, at 172–173. It does not follow, however, that Congress' failure to overturn a statutory precedent is reason for this Court to adhere to it. It is "impossible to assert with any degree of assurance that congressional failure to act represents" affirmative congressional approval of the Court's statutory interpretation. *Johnson* v. *Transportation Agency, Santa Clara County*, 480 U. S. 616, 671–672 (1987) (SCALIA, J., dissenting). Congress may legislate, moreover, only through the passage of a bill which is approved by both Houses and signed by the President. See U. S. Const., Art. I, § 7, cl. 2. Congressional inaction cannot amend a duly enacted statute. We think also that the materials relied upon by JUSTICE BRENNAN as "more positive signs of Congress' views," which are the *failure* of an amendment to a *different statute* offered *before* our decision in *Runyon*, see *post*, at 201–204, and the passage of an attorney's fee statute having nothing to do with our holding in *Runyon*, see *post*, at 204–205, demonstrate well the danger of placing undue reliance on the concept of congressional "ratification."

duct of which petitioner complains falls within one of the enumerated rights protected by § 1981.

A

Section 1981 reads as follows:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." Rev. Stat. § 1977.

The most obvious feature of the provision is the restriction of its scope to forbidding discrimination in the "mak[ing] and enforce[ment]" of contracts alone. Where an alleged act of discrimination does not involve the impairment of one of these specific rights, § 1981 provides no relief. Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts. See also *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 436 (1968) (§ 1982, the companion statute to § 1981, was designed "to prohibit all racial discrimination, whether or not under color of law, *with respect to the rights enumerated therein*") (emphasis added); *Georgia* v. *Rachel*, 384 U. S. 780, 791 (1966) ("The legislative history of the 1866 Act clearly indicates that Congress intended to protect a limited category of rights").

By its plain terms, the relevant provision in § 1981 protects two rights: "the same right . . . to make . . . contracts" and "the same right . . . to . . . enforce contracts." The first of these protections extends only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment. The statute prohibits,

when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms. But the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions. Such postformation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment, matters more naturally governed by state contract law and Title VII. See *infra*, at 179–180.

The second of these guarantees, "the same right . . . to . . . enforce contracts . . . as is enjoyed by white citizens," embraces protection of a legal process, and of a right of access to legal process, that will address and resolve contract-law claims without regard to race. In this respect, it prohibits discrimination that infects the legal process in ways that prevent one from enforcing contract rights, by reason of his or her race, and this is so whether this discrimination is attributed to a statute or simply to existing practices. It also covers wholly *private* efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations, as well as discrimination by private entities, such as labor unions, in enforcing the terms of a contract. Following this principle and consistent with our holding in *Runyon* that § 1981 applies to private conduct, we have held that certain private entities such as labor unions, which bear explicit responsibilities to process grievances, press claims, and represent member in disputes over the terms of binding obligations that run from the employer to the employee, are subject to liability under § 1981 for racial discrimination in the enforcement of labor contracts. See *Goodman* v. *Lukens Steel Co.*, 482 U. S. 656 (1987). The right to enforce contracts does not, however, extend beyond conduct by an employer which impairs an employee's ability

to enforce through legal process his or her established contract rights. As JUSTICE WHITE put it with much force in *Runyon*, one cannot seriously "contend that the grant of the other rights enumerated in § 1981, [that is, other than the right to "make" contracts,] *i. e.*, the rights 'to sue, be parties, give evidence,' and *'enforce* contracts' accomplishes anything other than the removal of *legal* disabilities to sue, be a party, testify or enforce a contract. Indeed, it is impossible to give such language any other meaning." 427 U. S., at 195, n. 5 (dissenting opinion) (emphasis in original).

B

Applying these principles to the case before us, we agree with the Court of Appeals that petitioner's racial harassment claim is not actionable under § 1981. Petitioner has alleged that during her employment with respondent, she was subjected to various forms of racial harassment from her supervisor. As summarized by the Court of Appeals, petitioner testified that

> "[her supervisor] periodically stared at her for several minutes at a time; that he gave her too many tasks, causing her to complain that she was under too much pressure; that among the tasks given her were sweeping and dusting, jobs not given to white employees. On one occasion, she testified, [her supervisor] told [her] that blacks are known to work slower than whites. According to [petitioner, her supervisor] also criticized her in staff meetings while not similarly criticizing white employees." 805 F. 2d, at 1145.

Petitioner also alleges that she was passed over for promotion, not offered training for higher level jobs, and denied wage increases, all because of her race.[2]

---

[2] In addition, another of respondent's managers testified that when he recommended a different black person for a position as a data processor, petitioner's supervisor stated that he did not "need any more problems

With the exception perhaps of her claim that respondent refused to promote her to a position as an accountant, see Part IV, *infra,* none of the conduct which petitioner alleges as part of the racial harassment against her involves either a refusal to make a contract with her or the impairment of her ability to enforce her established contract rights. Rather, the conduct which petitioner labels as actionable racial harassment is postformation conduct by the employer relating to the terms and conditions of continuing employment. This is apparent from petitioner's own proposed jury instruction on her § 1981 racial harassment claim:

". . . The plaintiff has also brought an action for harassment in employment against the defendant, under the same statute, 42 USC § 1981. An employer is guilty of racial discrimination in employment where it has either created or condoned a substantially discriminatory *work environment.* An employee has a right to work in an *environment* free from racial prejudice. If the plaintiff has proven by a preponderance of the evidence that she was subjected to racial harassment by her manager while employed at the defendant, or that she was subjected to a *work environment* not free from racial prejudice which was either created or condoned by the defendant, then it would be your duty to find for plaintiff on this issue." 1 Record, Doc. No. 18, p. 4 (emphasis added).

Without passing on the contents of this instruction, it is plain to us that what petitioner is attacking are the conditions of her employment.

This type of conduct, reprehensible though it be if true, is not actionable under § 1981, which covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal proc-

---

around here," and that he would "search for additional people who are not black." Tr. 2–160 to 2–161.

ess. Rather, such conduct is actionable under the more expansive reach of Title VII of the Civil Rights Act of 1964. The latter statute makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." 42 U. S. C. § 2000e–2(a)(1). Racial harassment in the course of employment is actionable under Title VII's prohibition against discrimination in the "terms, conditions, or privileges of employment." "[T]he [Equal Employment Opportunity Commission (EEOC)] has long recognized that harassment on the basis of race . . . is an unlawful employment practice in violation of § 703 of Title VII of the Civil Rights Act." See 2 EEOC Compliance Manual § 615.7 (1982). While this Court has not yet had the opportunity to pass directly upon this interpretation of Title VII, the lower federal courts have uniformly upheld this view,[3] and we implicitly have approved it in a recent decision concerning sexual harassment, *Meritor Savings Bank* v. *Vinson*, 477 U. S. 57, 65–66 (1986). As we said in that case, "harassment [which is] sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment,'" *id.*, at 67 (citation omitted), is actionable under Title VII because it "affects a 'term, condition, or privilege' of employment," *ibid.*

Interpreting § 1981 to cover postformation conduct unrelated to an employee's right to enforce his or her contract, such as incidents relating to the conditions of employment, is not only inconsistent with that statute's limitation to the making and enforcement of contracts, but would also undermine the detailed and well-crafted procedures for conciliation and resolution of Title VII claims. In Title VII, Congress set up an elaborate administrative procedure, implemented through the EEOC, that is designed to assist in the investi-

---

[3] See, *e. g.*, *Firefighters Institute for Racial Equality* v. *St. Louis*, 549 F. 2d 506, 514–515 (CA8), cert. denied *sub nom. Banta* v. *United States*, 434 U. S. 819 (1977); *Rogers* v. *EEOC*, 454 F. 2d 234 (CA5 1971), cert. denied, 406 U. S. 957 (1972).

gation of claims of racial discrimination in the workplace and to work towards the resolution of these claims through conciliation rather than litigation. See 42 U. S. C. § 2000e–5(b). Only after these procedures have been exhausted, and the plaintiff has obtained a "right to sue" letter from the EEOC, may he or she bring a Title VII action in court. See 42 U. S. C. § 2000e–5(f)(1). Section 1981, by contrast, provides no administrative review or opportunity for conciliation.

Where conduct is covered by both § 1981 and Title VII, the detailed procedures of Title VII are rendered a dead letter, as the plaintiff is free to pursue a claim by bringing suit under § 1981 without resort to those statutory prerequisites. We agree that, after *Runyon*, there is some necessary overlap between Title VII and § 1981, and that where the statutes do in fact overlap we are not at liberty "to infer any positive preference for one over the other." *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S., at 461. We should be reluctant, however, to read an earlier statute broadly where the result is to circumvent the detailed remedial scheme constructed in a later statute. See *United States* v. *Fausto*, 484 U. S. 439 (1988). That egregious racial harassment of employees is forbidden by a clearly applicable law (Title VII), moreover, should lessen the temptation for this Court to twist the interpretation of another statute (§ 1981) to cover the same conduct. In the particular case before us, we do not know for certain why petitioner chose to pursue only remedies under § 1981, and not under Title VII. See 805 F. 2d, at 1144, n.; Tr. of Oral Arg. 15–16, 23 (Feb. 29, 1988). But in any event, the availability of the latter statute should deter us from a tortuous construction of the former statute to cover this type of claim.

By reading § 1981 not as a general proscription of racial discrimination in all aspects of contract relations, but as limited to the enumerated rights within its express protection, specifically the right to make and enforce contracts, we may preserve the integrity of Title VII's procedures without sacrific-

ing any significant coverage of the civil rights laws.[4]   Of course, some overlap will remain between the two statutes: specifically, a refusal to enter into an employment contract on the basis of race.   Such a claim would be actionable under Title VII as a "refus[al] to hire" based on race, 42 U. S. C. § 2000e–2(a), and under § 1981 as an impairment of "the same right . . . to make . . . contracts . . . as . . . white citizens," 42 U. S. C. § 1981.   But this is precisely where it would make sense for Congress to provide for the overlap.   At this stage of the employee-employer relation Title VII's mediation and conciliation procedures would be of minimal effect, for there is not yet a relation to salvage.

## C

The Solicitor General and JUSTICE BRENNAN offer two alternative interpretations of § 1981.   The Solicitor General argues that the language of § 1981, especially the words "the same right," requires us to look outside § 1981 to the terms of particular contracts and to state law for the obligations and covenants to be protected by the federal statute.   Under this view, § 1981 has no actual substantive content, but instead mirrors only the specific protections that are afforded under the law of contracts of each State.   Under this view, racial harassment in the conditions of employment is actionable when, and only when, it amounts to a breach of contract under state law.   We disagree.   For one thing, to the extent that it assumes that prohibitions contained in § 1981 incorporate only those protections afforded by the States, this theory is directly inconsistent with *Runyon*, which we today

---

[4] Unnecessary overlap between Title VII and § 1981 would also serve to upset the delicate balance between employee and employer rights struck by Title VII in other respects.   For instance, a plaintiff in a Title VII action is limited to a recovery of backpay, whereas under § 1981 a plaintiff may be entitled to plenary compensatory damages, as well as punitive damages in an appropriate case.   Both the employee and employer will be unlikely to agree to a conciliatory resolution of the dispute under Title VII if the employer can be found liable for much greater amounts under § 1981.

decline to overrule. A more fundamental failing in the Solicitor's argument is that racial harassment amounting to breach of contract, like racial harassment alone, impairs neither the right to make nor the right to enforce a contract. It is plain that the former right is not implicated directly by an employer's breach in the performance of obligations under a contract already formed. Nor is it correct to say that racial harassment amounting to a breach of contract impairs an employee's right to enforce his contract. To the contrary, conduct amounting to a breach of contract under state law is precisely what the language of § 1981 does not cover. That is because, in such a case, provided that plaintiff's access to state court or any other dispute resolution process has not been impaired by either the State or a private actor, see *Goodman* v. *Lukens Steel Co.*, 482 U. S. 656 (1987), the plaintiff is free to enforce the terms of the contract in state court, and cannot possibly assert, by reason of the breach alone, that he has been deprived of the same right to enforce contracts as is enjoyed by white citizens.

In addition, interpreting § 1981 to cover racial harassment amounting to a breach of contract would federalize all state-law claims for breach of contract where racial animus is alleged, since § 1981 covers all types of contracts, not just employment contracts. Although we must do so when Congress plainly directs, as a rule we should be and are "reluctant to federalize" matters traditionally covered by state common law. *Santa Fe Industries, Inc.* v. *Green*, 430 U. S. 462, 479 (1977); see also *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479, 507 (1985) (MARSHALL, J., dissenting). By confining § 1981 to the impairment of the specific rights to make and enforce contracts, Congress cannot be said to have intended such a result with respect to breach of contract claims. It would be no small paradox, moreover, that under the interpretation of § 1981 offered by the Solicitor General, the more a State extends its own contract law to protect employees in general and minorities in particular, the greater

would be the potential displacement of state law by § 1981. We do not think § 1981 need be read to produce such a peculiar result.

JUSTICE BRENNAN, for his part, would hold that racial harassment is actionable under § 1981 when "the acts constituting harassment [are] sufficiently severe or pervasive as effectively to belie any claim that the contract was entered into in a racially neutral manner." See *post*, at 208. We do not find this standard an accurate or useful articulation of which contract claims are actionable under § 1981 and which are not. The fact that racial harassment is "severe or pervasive" does not by magic transform a challenge to the conditions of employment, not actionable under § 1981, into a viable challenge to the employer's refusal to make a contract. We agree that racial harassment may be used as evidence that a divergence in the explicit terms of particular contracts is explained by racial animus.[5] Thus, for example, if a potential employee is offered (and accepts) a contract to do a job for less money than others doing like work, evidence of racial harassment in the workplace may show that the employer, at the time of formation, was unwilling to enter into a nondiscriminatory contract. However, and this is the critical point, the question under § 1981 remains whether the employer, *at the time of the formation of the contract,* in fact intentionally refused to enter into a contract with the employee on racially neutral terms. The plaintiff's ability to plead that the racial harassment is "severe or pervasive" should not allow him to bootstrap a challenge to the conditions of employment (actionable, if at all, under Title VII) into a claim under § 1981 that the employer refused to offer petitioner the "same right . . . to make" a contract. We think it clear that the conduct challenged by petitioner relates not to her employer's refusal to

---

[5]This was the permissible use of evidence of racial harassment that the Fourth Circuit, in its decision below, envisioned for § 1981 cases. See 805 F. 2d 1143, 1145 (1986).

enter into a contract with her, but rather to the conditions of her employment.[6]

## IV

Petitioner's claim that respondent violated § 1981 by failing to promote her, because of race, to a position as an intermediate accounting clerk is a different matter. As a preliminary point, we note that the Court of Appeals distinguished between petitioner's claims of racial harassment and discriminatory promotion, stating that although the former did not give rise to a discrete § 1981 claim, "[c]laims of racially discriminatory . . . promotion go to the very existence and nature of the employment contract and thus fall easily within § 1981's protection." 805 F. 2d, at 1145. We think that somewhat overstates the case. Consistent with what we have said in Part III, *supra,* the question whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under § 1981. In making this determination, a lower court should give a fair and natural reading to the statutory phrase "the same right . . . to make . . . contracts," and should not strain in an undue manner the language of § 1981. Only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981. Cf. *Hishon* v. *King & Spaulding,* 467 U. S. 69 (1984)

---

[6] In his separate opinion, JUSTICE STEVENS construes the phrase "the same right . . . to make . . . contracts" with ingenuity to cover various postformation conduct by the employer. But our task here is not to construe § 1981 to punish all acts of discrimination in contracting in a like fashion, but rather merely to give a fair reading to scope of the statutory terms used by Congress. We adhere today to our decision in *Runyon* that § 1981 reaches private conduct, but do not believe that holding compels us to read the statutory terms "make" and "enforce" beyond their plain and commonsense meaning. We believe that the lower courts will have little difficulty applying the straightforward principles that we announce today.

(refusal of law firm to accept associate into partnership) (Title VII). Because respondent has not argued at any stage that petitioner's promotion claim is not cognizable under § 1981, we need not address the issue further here.

This brings us to the question of the District Court's jury instructions on petitioner's promotion claim. We think the District Court erred when it instructed the jury that petitioner had to prove that she was better qualified than the white employee who allegedly received the promotion. In order to prevail under § 1981, a plaintiff must prove purposeful discrimination. *General Building Contractors Assn., Inc.* v. *Pennsylvania*, 458 U. S. 375, 391 (1982). We have developed, in analogous areas of civil rights law, a carefully designed framework of proof to determine, in the context of disparate treatment, the ultimate issue whether the defendant intentionally discriminated against the plaintiff. See *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248 (1981); *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792 (1973). We agree with the Court of Appeals that this scheme of proof, structured as a "sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination," *Furnco Construction Corp.* v. *Waters*, 438 U. S. 567, 577 (1978), should apply to claims of racial discrimination under § 1981.

Although the Court of Appeals recognized that the *McDonnell Douglas/Burdine* scheme of proof should apply in § 1981 cases such as this one, it erred in describing petitioner's burden. Under our well-established framework, the plaintiff has the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. *Burdine*, 450 U. S., at 252–253. The burden is not onerous. *Id.*, at 253. Here, petitioner need only prove by a preponderance of the evidence that she applied for and was qualified for an available position, that she was rejected, and that after she was rejected respondent either continued to seek applicants for the position, or, as is alleged here, filled the position with a

white employee. See *id.*, at 253, and n. 6; *McDonnell Douglas, supra,* at 802.[7]

Once the plaintiff establishes a prima facie case, an inference of discrimination arises. See *Burdine,* 450 U. S., at 254. In order to rebut this inference, the employer must present evidence that the plaintiff was rejected, or the other applicant was chosen, for a legitimate nondiscriminatory reason. See *ibid.* Here, respondent presented evidence that it gave the job to the white applicant because she was better qualified for the position, and therefore rebutted any presumption of discrimination that petitioner may have established. At this point, as our prior cases make clear, petitioner retains the final burden of persuading the jury of intentional discrimination. See *id.*, at 256.

Although petitioner retains the ultimate burden of persuasion, our cases make clear that she must also have the opportunity to demonstrate that respondent's proffered reasons for its decision were not its true reasons. *Ibid.* In doing so, petitioner is not limited to presenting evidence of a certain type. This is where the District Court erred. The evidence which petitioner can present in an attempt to establish that respondent's stated reasons are pretextual may take a variety of forms. See *McDonnell Douglas, supra,* at 804–805; *Furnco Construction Corp., supra,* at 578; cf. *United States Postal Service Bd. of Governors* v. *Aikens,* 460 U. S. 711, 714, n. 3 (1983). Indeed, she might seek to demonstrate that respondent's claim to have promoted a better qualified applicant was pretextual by showing that she was in fact

---

[7] Here, respondent argues that petitioner cannot make out a prima facie case on her promotion claim because she did not prove either that respondent was seeking applicants for the intermediate accounting clerk position or that the white employee named to fill that position in fact received a "promotion" from her prior job. Although we express no opinion on the merits of these claims, we do emphasize that in order to prove that she was denied the same right to make and enforce contracts as white citizens, petitioner must show, *inter alia*, that she was in fact denied an *available* position.

better qualified than the person chosen for the position. The District Court erred, however, in instructing the jury that in order to succeed petitioner was *required* to make such a showing. There are certainly other ways in which petitioner could seek to prove that respondent's reasons were pretextual. Thus, for example, petitioner could seek to persuade the jury that respondent had not offered the true reason for its promotion decision by presenting evidence of respondent's past treatment of petitioner, including the instances of the racial harassment which she alleges and respondent's failure to train her for an accounting position. See *supra*, at 178. While we do not intend to say this evidence necessarily would be sufficient to carry the day, it cannot be denied that it is one of the various ways in which petitioner might seek to prove intentional discrimination on the part of respondent. She may not be forced to pursue any particular means of demonstrating that respondent's stated reasons are pretextual. It was, therefore, error for the District Court to instruct the jury that petitioner could carry her burden of persuasion only by showing that she was in fact better qualified than the white applicant who got the job.

## V

The law now reflects society's consensus that discrimination based on the color of one's skin is a profound wrong of tragic dimension. Neither our words nor our decisions should be interpreted as signaling one inch of retreat from Congress' policy to forbid discrimination in the private, as well as the public, sphere. Nevertheless, in the area of private discrimination, to which the ordinance of the Constitution does not directly extend, our role is limited to interpreting what Congress may do and has done. The statute before us, which is only one part of Congress' extensive civil rights legislation, does not cover the acts of harassment alleged here.

In sum, we affirm the Court of Appeals' dismissal of petitioner's racial harassment claim as not actionable under § 1981. The Court of Appeals erred, however, in holding that petitioner could succeed in her discriminatory promotion claim under § 1981 only by proving that she was better qualified for the position of intermediate accounting clerk than the white employee who in fact was promoted. The judgment of the Court of Appeals is therefore vacated insofar as it relates to petitioner's discriminatory promotion claim, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, and with whom JUSTICE STEVENS joins as to Parts II–B, II–C, and III, concurring in the judgment in part and dissenting in part.

What the Court declines to snatch away with one hand, it takes with the other. Though the Court today reaffirms § 1981's applicability to private conduct, it simultaneously gives this landmark civil rights statute a needlessly cramped interpretation. The Court has to strain hard to justify this choice to confine § 1981 within the narrowest possible scope, selecting the most pinched reading of the phrase "same right to make a contract," ignoring powerful historical evidence about the Reconstruction Congress' concerns, and bolstering its parsimonious rendering by reference to a statute enacted nearly a century after § 1981, and plainly not intended to affect its reach. When it comes to deciding whether a civil rights statute should be construed to further our Nation's commitment to the eradication of racial discrimination, the Court adopts a formalistic method of interpretation antithetical to Congress' vision of a society in which contractual opportunities are equal. I dissent from the Court's holding that § 1981 does not encompass Patterson's racial harassment claim.

I

Thirteen years ago, in deciding *Runyon* v. *McCrary*, 427 U. S. 160 (1976), this Court treated as already "well established" the proposition that "§ 1 of the Civil Rights Act of 1866, 14 Stat. 27, 42 U. S. C. § 1981, prohibits racial discrimination in the making and enforcement of private contracts," as well as state-mandated inequalities, drawn along racial lines, in individuals' ability to make and enforce contracts. *Id.*, at 168, citing *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454 (1975); *Tillman* v. *Wheaton-Haven Recreation Assn., Inc.*, 410 U. S. 431 (1973); and *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968). Since deciding *Runyon*, we have upon a number of occasions treated as settled law its interpretation of § 1981 as extending to private discrimination. *Goodman* v. *Lukens Steel Co.*, 482 U. S. 656 (1987); *Saint Francis College* v. *Al-Khazraji*, 481 U. S. 604 (1987); *General Building Contractors Assn., Inc.* v. *Pennsylvania*, 458 U. S. 375 (1982); *Delaware State College* v. *Ricks*, 449 U. S. 250 (1980); *McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U. S. 273 (1976). We have also reiterated our holding in *Jones* that 42 U. S. C. § 1982 similarly applies to private discrimination in the sale or rental of real or personal property—a holding arrived at through an analysis of legislative history common to both § 1981 and § 1982. *Shaare Tefila Congregation* v. *Cobb*, 481 U. S. 615 (1987); *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229 (1969).

The Court's reaffirmation of this long and consistent line of precedents establishing that § 1981 encompasses private discrimination is based upon its belated decision to adhere to the principle of *stare decisis*—a decision that could readily, and would better, have been made before the Court decided to put *Runyon* and its progeny into question by ordering reargument in this case. While there is an exception to *stare decisis* for precedents that have proved "outdated, . . . unworkable, or otherwise legitimately vulnerable to serious

reconsideration," *Vasquez* v. *Hillery*, 474 U. S. 254, 266 (1986), it has never been arguable that *Runyon* falls within it. Rather, *Runyon* is entirely consonant with our society's deep commitment to the eradication of discrimination based on a person's race or the color of her skin. See *Bob Jones University* v. *United States*, 461 U. S. 574, 593 (1983) ("[E]very pronouncement of this Court and myriad Acts of Congress and Executive Orders attest a firm national policy to prohibit racial segregation and discrimination"). That commitment is not bounded by legal concepts such as "state action," but is the product of a national consensus that racial discrimination is incompatible with our best conception of our communal life, and with each individual's rightful expectation that her full participation in the community will not be contingent upon her race. In the past, this Court has overruled decisions antagonistic to our Nation's commitment to the ideal of a society in which a person's opportunities do not depend on her race, *e. g.*, *Brown* v. *Board of Education*, 347 U. S. 483 (1954) (overruling *Plessy* v. *Ferguson*, 163 U. S. 537 (1896)), and I find it disturbing that the Court has in this case chosen to reconsider, without any request from the parties, a statutory construction so in harmony with that ideal.

Having decided, however, to reconsider *Runyon*, and now to reaffirm it by appeal to *stare decisis*, the Court glosses over what are in my view two very obvious reasons for refusing to overrule this interpretation of § 1981: that *Runyon* was correctly decided, and that in any event Congress has ratified our construction of the statute.

## A

A survey of our cases demonstrates that the Court's interpretation of § 1981 has been based upon a full and considered review of the statute's language and legislative history, assisted by careful briefing, upon which no doubt has been cast by any new information or arguments advanced in the briefs filed in this case.

In *Jones* v. *Alfred H. Mayer Co.*, *supra*, this Court considered whether § 1982, which provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property," prohibits private discrimination on the basis of race, and if so, whether the statute is constitutional. The Court held, over two dissenting votes, that § 1982 bars private, as well as public, racial discrimination, and that the statute was a valid exercise of Congress' power under § 2 of the Thirteenth Amendment to identify the badges and incidents of slavery and to legislate to end them.

The Court began its careful analysis in *Jones* by noting the expansive language of § 1982, and observing that a black citizen denied the opportunity to purchase property as a result of discrimination by a private seller cannot be said to have the "same right" to purchase property as a white citizen. 392 U. S., at 420–421. The Court also noted that, in its original form, § 1982 had been part of § 1 of the Civil Rights Act of 1866,[1] and that § 2 of the 1866 Act provided for criminal penalties against any person who violated rights secured or

---

[1] Act of Apr. 9, 1866, ch. 31, § 1, 14 Stat. 27. Section 1 provided:

"[C]itizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

All members of the Court agreed in *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968), that intervening revisions in the property clause of § 1— the reenactment of the 1866 Act in § 18 of the Voting Rights Act of 1870, ch. 114, § 18, 16 Stat. 144, the codification of the property clause in § 1978 of the Revised Statutes of 1874, and its recodification as 42 U. S. C. § 1982—had not altered its substance. *Jones*, 392 U. S., at 436–437 (opinion of the Court); *id.*, at 453 (dissenting opinion).

protected by the Act "under color of any law, statute, ordinance, regulation, or custom." 392 U. S., at 424–426. This explicit limitation upon the scope of § 2, to exclude criminal liability for private violations of § 1, strongly suggested that § 1 itself prohibited private discrimination, for otherwise the limiting language of § 2 would have been redundant. *Ibid.* Although Justice Harlan, in dissent, thought a better explanation of the language of § 2 was that it "was carefully drafted to enforce all of the rights secured by § 1," *id.*, at 454, it is by no means obvious why the dissent's view should be regarded as the more accurate interpretation of the structure of the 1866 Act.[2]

The Court then engaged in a particularly thorough analysis of the legislative history of § 1 of the 1866 Act, *id.*, at 422–437, which had been discussed at length in the briefs of both parties and their *amici*.[3] While never doubting that the prime targets of the 1866 Act were the Black Codes, in which the Confederate States imposed severe disabilities on the freedmen in an effort to replicate the effects of slavery, see, *e. g.*, 1 C. Fairman, Reconstruction and Reunion 1864–1888, pp. 110–117 (1971) (discussing Mississippi's Black Codes), the Court concluded that Congress also had intended § 1 to reach private discriminatory conduct. The Court cited

---

[2] In support of its view, the Court in *Jones* quoted from an exchange during the House debate on the civil rights bill. When Congressman Loan of Missouri asked the Chairman of the House Judiciary Committee why § 2 had been limited to those who acted under color of law, he was told, not that the statute had no application at all to those who had not acted under color of law, but that the limitation had been imposed because it was not desired to make "'a general criminal code for the States.'" *Id.*, at 425, n. 33, quoting Cong. Globe, 39th Cong., 1st Sess., 1120 (1866). Justice Harlan in dissent conceded that the Court's interpretation of this exchange as supporting a broader reading of § 1 was "a conceivable one." 392 U. S., at 470.

[3] See, *e. g.*, Brief for Petitioners 12–16, Brief for Respondents 7–24, Brief for United States as *Amicus Curiae* 28–35, 38–51, and Brief for National Committee Against Discrimination in Housing et al. as *Amici Curiae* 9–39, in *Jones* v. *Alfred H. Mayer Co.*, O. T. 1967, No. 45.

a bill (S. 60) to amend the Freedmen's Bureau Act, introduced prior to the civil rights bill, and passed by both Houses during the 39th Congress (though it was eventually vetoed by President Johnson), as persuasive evidence that Congress was fully aware that any newly recognized rights of blacks would be as vulnerable to private as to state infringement. 392 U. S., at 423, and n. 30. The amendment would have extended the jurisdiction of the Freedmen's Bureau over all cases in the former Confederate States involving the denial on account of race of rights to make and enforce contracts or to purchase or lease property, "in consequence of any State or local law, ordinance, police, or other regulation, custom, *or prejudice.*" Cong. Globe, 39th Cong., 1st Sess., 209 (1866) (emphasis added). When the civil rights bill was subsequently introduced, Representative Bingham specifically linked it in scope to S. 60. *Id.*, at 1292. See *Jones*, 392 U. S., at 424, n. 31.

The Court further noted that there had been "an imposing body of evidence [before Congress] pointing to the mistreatment of Negroes by private individuals and unofficial groups, mistreatment unrelated to any hostile state legislation." *Id.*, at 427. This evidence included the comprehensive report of Major General Carl Schurz on conditions in the Confederate States. This report stressed that laws were only part of the problem facing the freedmen, who also encountered private discrimination and often brutality.[4] The con-

---

[4] Report of C. Schurz, S. Exec. Doc. No. 2, 39th Cong., 1st Sess. (1865). The Schurz report is replete with descriptions of private discrimination, relating both to the freedmen's ability to enter into contracts and to their treatment once under contract. It notes, for example, that some planters had initially endeavored to maintain "the relation of master and slave, partly by concealing from [their slaves] the great changes that had taken place, and partly by terrorizing them into submission to their behests." *Id.*, at 15. It portrays as commonplace the use of "force and intimidation" to keep former slaves on the plantations:

"In many instances negroes who walked away from the plantations, or were found upon the roads, were shot or otherwise severely punished,

gressional debates on the Freedmen's Bureau and civil rights bills show that legislators were well aware that the rights of former slaves were as much endangered by private action as by legislation.   See *id.*, at 427–428, and nn. 37–40.   To be sure, there is much emphasis in the debates on the evils of the Black Codes.   But there are also passages that indicate that Congress intended to reach private discrimination that posed an equal threat to the rights of the freedmen.   See *id.*, at 429–437.   Senator Trumbull, for example, promised to introduce a bill aimed not only at "local legislation," but also at any "prevailing public sentiment" that blacks in the South "should continue to be oppressed and in fact deprived of their free-

---

which was calculated to produce the impression among those remaining with their masters that an attempt to escape from slavery would result in certain destruction."   *Id.*, at 17.

In Georgia, Schurz reported, "the reckless and restless characters of that region had combined to keep the negroes where they belonged," shooting those caught trying to escape.   *Id.*, at 18.   The effect of this private violence against those who tried to leave their former masters was that "large numbers [of freedmen], terrified by what they saw and heard, quietly remained under the restraint imposed upon them."   *Ibid.*   See *Jones*, 392 U. S., at 428–429.

   It must therefore have been evident to members of the 39th Congress that, quite apart from the Black Codes, the freedmen would not enjoy the same right as whites to contract or to own or lease property so long as private discrimination remained rampant.   This broad view of the obstacles to the freedmen's enjoyment of contract and property rights was similarly expressed in the Howard Report on the operation of the Freedmen's Bureau, H. R. Exec. Doc. No. 11, 39th Cong., 1st Sess. (1865).   It likewise appears in the hearings conducted by the Joint Committee on Reconstruction contemporaneously with Congress' consideration of the civil rights bill. See Report of the Joint Committee on Reconstruction, 39th Cong., 1st Sess., pts. I–IV (1866).   These investigations uncovered numerous incidents of violence aimed at restraining southern blacks' efforts to exercise their new-won freedom, *e. g.*, *id.*, pt. III, p. 143, and whippings aimed simply at making them work harder, or handed out as punishment for a laborer's transgressions, *e. g.*, *id.*, pt. IV, p. 83, as well, for example, as refusals to pay freedmen more than a fraction of white laborers' wages, *e. g.*, *id.*, pt. II, pp. 12–13, 54–55, 234.

dom." Cong. Globe, 39th Cong., 1st Sess., 77 (1866), quoted in *Jones, supra,* at 431.[5] In the *Jones* Court's view, which I share, Congress said enough about the injustice of private discrimination, and the need to end it, to show that it did indeed intend the Civil Rights Act to sweep that far.

Because the language of both § 1981 and § 1982 appeared traceable to § 1 of the Civil Rights Act of 1866, the decision in *Jones* was naturally taken to indicate that § 1981 also prohibited private racial discrimination in the making and enforcement of contracts. Thus, in *Tillman* v. *Wheaton-Haven Recreation Assn., Inc.,* 410 U. S., at 440, the Court held that "[i]n light of the historical interrelationship between § 1981 and § 1982," there was no reason to construe those sections differently as they related to a claim that a community swimming club denied property-linked membership preferences to blacks; and in *Johnson* v. *Railway Express Agency, Inc.,* 421 U. S., at 459–460, the Court stated that "§ 1981 affords a federal remedy against discrimination in private employment on the basis of race." The Court only addressed the scope of § 1981 in any depth, however, in *Runyon* v. *McCrary,* 427 U. S. 160 (1976), where we held that § 1981 prohibited racial discrimination in the admissions policy of a private school. That issue was directly presented and fully briefed in *Runyon.*[6]

---

[5] Senator Trumbull was speaking here of his Freedmen's Bureau bill, which was regarded as having the same scope as his later civil rights bill. See *supra,* at 193–194.

For other statements indicating that § 1 reached private conduct, see Cong. Globe, 39th Cong., 1st Sess., 1118 (1866) ("Laws barbaric and treatment inhuman are the rewards meted out by our white enemies to our colored friends. We should put a stop to this at once and forever") (Rep. Wilson); *id.,* at 1152 (bill aimed at "the tyrannical *acts,* the tyrannical restrictions, and the tyrannical laws which belong to the condition of slavery") (emphasis added) (Rep. Thayer).

[6] See, *e. g.,* Brief for Petitioners 2, 6–11, Brief for Respondents 13–22, and Brief for United States as *Amicus Curiae* 13–18, in *Runyon* v. *Mc-*

Although the Court in *Runyon* treated it as settled by *Jones*, *Tillman*, and *Johnson* that § 1981 prohibited private racial discrimination in contracting, it nevertheless discussed in detail the claim that § 1981 is narrower in scope than § 1982. The primary focus of disagreement between the majority in *Runyon* and JUSTICE WHITE's dissent, a debate renewed by the parties here on reargument, concerns the origins of § 1981. Section 1 of the 1866 Act was expressly reenacted by § 18 of the Voting Rights Act of 1870. Act of May 31, 1870, ch. 114, § 18, 16 Stat. 144. Section 16 of the 1870 Act nevertheless also provided that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts . . . ." *Ibid.* Section 1 of the 1866 Act, as reenacted by § 18 of the 1870 Act, was passed under Congress' Thirteenth Amendment power to identify and legislate against the badges and incidents of slavery, and, we held in *Jones*, applied to private acts of discrimination. The dissent in *Runyon*, however, argued that § 16 of the 1870 Act was enacted solely under Congress' Fourteenth Amendment power to prohibit States from denying any person the equal protection of the laws, and could have had no application to purely private discrimination. See *Runyon*, *supra*, at 195–201 (WHITE, J., dissenting). But see *District of Columbia* v. *Carter*, 409 U. S. 418, 424, n. 8 (1973) (suggesting Congress has the power to proscribe purely private conduct under § 5 of the Fourteenth Amendment). When all existing federal statutes were codified in the Revised Statutes of 1874, the Statutes included but a single provision prohibiting racial discrimination in the making and enforcement of contracts — § 1977, which was identical to the current § 1981. The *Runyon* dissenters believed that this provision derived solely from § 16 of the 1870 Act, that the analysis of § 1 in

*Crary*, O. T. 1975, No. 75–62; Brief for Petitioner 17–59, in *Fairfax-Brewster School, Inc.* v. *Gonzales*, O. T. 1975, No. 75–66.

*Jones* was of no application to § 1981, and that § 1981 hence could not be interpreted to prohibit private discrimination.

The Court concluded in *Runyon*, however—correctly, I believe—that § 1977 derived *both* from § 1 of the 1866 Act (as reenacted) and from § 16 of the 1870 Act, and thus was to be interpreted, in light of the decision in *Jones*, as applying to private conduct. See also *General Building Contractors Assn., Inc.* v. *Pennsylvania*, 458 U. S., at 390, n. 17 ("[Section] 1981, because it is derived in part from the 1866 Act, has roots in the Thirteenth as well as the Fourteenth Amendment"). This result followed, the Court held, from the terms of the 1874 revision of the statutes. The revisers who prepared the codification had authority only to "revise, simplify, arrange, and consolidate" existing laws, to omit "redundant or obsolete" provisions, and to make suggestions for repeal. Act of June 27, 1866, 14 Stat. 74–75. See *Runyon*, 427 U. S., at 168, n. 8. The revisers made no recommendation that § 1 of the 1866 Act, as reenacted, be repealed, and obviously the broad 1866 provision, applying to private actors, was not made redundant or obsolete by § 16 of the 1870 Act, with its potentially narrower scope. Hence it is most plausible to think that § 1977 was a consolidation of § 1 and of § 16. *Id.*, at 169, n. 8. The *Runyon* Court explained that a revisers' note printed alongside § 1977, indicating that it was derived from § 16, but not mentioning § 1 or its reenactment, had to be viewed in light of the terms of the codification as either inadvertent or an error, and declined "to attribute to Congress an intent to repeal a major piece of Reconstruction legislation on the basis of an unexplained omission from the revisers' marginal notes." *Ibid.*[7] Respondent has supplied

---

[7] Congress originally entrusted the revision of the laws to three Commissioners appointed under the Act of June 27, 1866, 14 Stat. 74–75. These Commissioners were instructed to draft sidenotes indicating the source of each section of their revision, § 2, *id.*, at 75, and they wrote the marginal note to what became § 1977 of the Revised Statutes, which referred as a source only to § 16 of the 1870 Act. See 1 Revision of the

no new information suggesting that the Court's conclusion as to the dual origins of § 1981 was mistaken.[8]   In sum, I find the careful analysis in both *Jones* and *Runyon* persuasive.

---

United States Statutes as Drafted by the Commissioners Appointed for that Purpose 947 (1872).   Congress rejected the work of the Commissioners, however, precisely because Members believed it to contain new legislation.   See 2 Cong. Rec. 646 (1874).   Congress then appointed Thomas Durant to review the Commissioners' work.   See Act of Mar. 3, 1873, § 3, 17 Stat. 580.   "[W]herever the meaning of the law had been changed," Durant was "to strike out such changes."   2 Cong. Rec. 646 (1874).   Durant reported that he had compared the Commissioners' revision with preexisting statutes, and that "wherever it has been found that a section contained any departure from the meaning of Congress as expressed in the Statutes at Large, such change has been made as was necessary to restore the original signification."   Report to the Joint Committee on the Revision of the Laws 1 (1873).   Durant's revision, H. R. 1215, 43d Cong., 1st Sess. (1874), which was put before Congress in the form of a bill, see 2 Cong. Rec. 819 (1874), contained no marginal notations.   See *id.*, at 826–827, 1210.   The Commissioners' reference to § 16 reappeared only after Congress authorized the Secretary of State to publish the Revised Statutes with marginal notations.   See Act of June 20, 1874, ch. 333, § 2, 18 Stat. (part 3) 113.   Apparently, the Secretary simply lifted notations from the Commissioners' draft revision.   Hence, insofar as Durant might have thought that the Commissioners had changed the law by referring only to § 16 as their source, and that this problem had been cured merely by the omission of the marginal note from his own draft, it seems strained to rely upon the later decision to restore the Commissioners' marginal notes as evidence that § 1977 derives solely from § 16.   This is particularly so in light of criticism directed in Congress to the accuracy of some of the Commissioners' side-notes.   See 2 Cong. Rec. 828 (1874) (citing as an error a marginal note that was "not sufficently comprehensive" to reflect the provision's source) (Rep. Lawrence).

[8] I find strong support for our prior holding that § 1981 is derived in part from the 1866 Act in the legislative history of the 1874 codification.   Representative Lawrence, a member of the Joint Committee on the Revision of the Laws, specifically commented in the House upon the proposed revision of the 1866 and 1870 Acts.   *Id.*, at 827–828.   He noted that the plan of revision was "to collate in one title of 'civil rights' the statutes which declare them."   *Id.*, at 827.   After setting out § 1 and § 2 of the 1866 Act, and then § 16 and § 17 of the 1870 Act, Representative Lawrence stated that the revisers had "very properly not treated [the 1870 Act] as super-

## B

Even were there doubts as to the correctness of *Runyon*, Congress has in effect ratified our interpretation of § 1981, a fact to which the Court pays no attention. We have justified our practice of according special weight to statutory precedents, see *ante*, at 172–173, by reference to Congress' ability to correct our interpretations when we have erred. To be sure, the absence of legislative correction is by no means in all cases determinative, for where our prior interpretation of a statute was plainly a mistake, we are reluctant to "'place on the shoulders of Congress the burden of the Court's own error.'" *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 695 (1978), quoting *Girouard* v. *United States*, 328 U. S. 61, 70 (1946). Where our prior interpretation of congressional intent was plausible, however—which is the very least that can be said for our construction of § 1981 in *Runyon*—we have often taken Congress' subsequent inaction as probative to varying degrees, depending upon the circumstances, of its acquiescence. See *Johnson* v. *Transportation Agency, Santa Clara County*, 480 U. S. 616, 629–630, n. 7 (1987). Given the frequency with which Congress has in recent years acted to overturn this Court's mistaken interpretations of civil rights statutes,[9] its failure to enact legislation

---

seding the entire original act." *Id.*, at 828. Rather, they had "translat[ed] the sections I have cited from the acts of 1866 and 1870, so far as they relate to a declaration of existing rights," in the provisions that have now become § 1981 and § 1982. *Ibid.* There is no hint in this passage that any part of the 1866 Act would be lost in the revision, and indeed in other parts of his statement Representative Lawrence makes it plain that he understood the revisers' task to be that of presenting "the actual state of the law." *Id.*, at 826. See also *id.*, at 647–649 (general discussion on the aim of the revision to codify existing law without modification), and *id.*, at 1210 ("[W]e do not purpose to alter the law one jot or tittle") (Rep. Poland).

[9] See, *e. g.*, Civil Rights Attorney's Fees Awards Act of 1976, Pub. L. 94–559, 90 Stat. 2641, 42 U. S. C. § 1988 (overturning *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240 (1975)); Pregnancy Discrimination Act, Pub. L. 95–555, 92 Stat. 2076, 42 U. S. C. § 2000e(k)

to overturn *Runyon* appears at least to some extent indicative of a congressional belief that *Runyon* was correctly decided. It might likewise be considered significant that no other legislative developments have occurred that cast doubt on our interpretation of § 1981. Cf., *e. g.*, *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 233–234 (1987) (regulatory developments); *Monell, supra*, at 697–699; *Califano* v. *Sanders*, 430 U. S. 99, 105–107 (1977).

There is no cause, though, to consider the precise weight to attach to the fact that Congress has not overturned or otherwise undermined *Runyon*. For in this case we have more positive signs of Congress' views. Congress has considered and rejected an amendment that would have rendered § 1981 unavailable in most cases as a remedy for private employment discrimination, which is evidence of congressional acquiescence that is "something other than mere congressional silence and passivity." *Flood* v. *Kuhn*, 407 U. S. 258, 283 (1972). In addition, Congress has built upon our interpretation of § 1981 in enacting a statute that provides for the recovery of attorney's fees in § 1981 actions.

After the Court's decision in *Jones* v. *Alfred H. Mayer Co.*, Congress enacted the Equal Employment Opportunity Act of 1972, Pub. L. 92–261, 86 Stat. 103, amending Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq*. During Congress' consideration of this legislation—by which time there had been ample indication that § 1981 was being

(overturning *General Electric Co.* v. *Gilbert*, 429 U. S. 125 (1976); see *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669 (1983)); Voting Rights Act Amendments of 1982, Pub. L. 97–205, 96 Stat. 131, 42 U. S. C. § 1973 (overturning *Mobile* v. *Bolden*, 446 U. S. 55 (1980); see, *e. g.*, H. R. Rep. No. 97–227, pp. 28–30 (1981)); Handicapped Children's Protection Act of 1986, Pub. L. 99–372, 100 Stat. 796, 20 U. S. C. §§ 1415(e)(4)(B)–(G) (1982 ed., Supp. V) (overturning *Smith* v. *Robinson*, 468 U. S. 992 (1984); see *e. g.*, H. R. Rep. No. 99–296, p. 4 (1985)); Civil Rights Restoration Act of 1987, Pub. L. 100–259, 102 Stat. 28, note following 20 U. S. C. § 1687 (overturning *Grove City College* v. *Bell*, 465 U. S. 555 (1984); see, *e. g.*, S. Rep. No. 100–64, p. 2 (1987)).

interpreted to apply to private acts of employment discrimination[10]—it was suggested that Title VII rendered redundant the availability of a remedy for employment discrimination under provisions derived from the Civil Rights Act of 1866. Some concluded that Title VII should be made, with limited exceptions, the exclusive remedy for such discrimination. See H. R. Rep. No. 92–238, pp. 66–67 (1971) (minority views). Senator Hruska proposed an amendment to that effect. 118 Cong. Rec. 3172 (1972). Speaking for his amendment, Senator Hruska stated his belief that under existing law private employment discrimination would give rise to a § 1981 claim. He complained specifically that without a provision making Title VII an exclusive remedy, "a black female employee [alleging] a denial of either a promotion or pay raise . . . because of her color," might "completely bypass" Title VII by filing "a complaint in Federal court under the provisions of the Civil Rights Act of 1866 against . . . the employer." *Id.*, at 3368, 3369. In speaking against the Hruska amendment, Senator Williams, floor manager of the bill, stated that it was not the purpose of the bill "to repeal existing civil rights laws," and that to do so "would severely weaken our overall effort to combat the presence of employment discrimination." *Id.*, at 3371. He referred to § 1981 as an existing protection that should not be limited by the amendments to Title VII:

"The right of individuals to bring suits in Federal courts to redress individual acts of discrimination, including

---

[10] The Court had remarked in *Jones* upon the close parallel between § 1981 and § 1982. 392 U. S., at 441, n. 78. Moreover, the lower federal courts already had begun to interpret § 1981 to reach private employment discrimination. See, *e. g.*, *Waters* v. *Wisconsin Steel Works*, 427 F. 2d 476 (CA7), cert. denied, 400 U. S. 911 (1970); *Sanders* v. *Dobbs Houses, Inc.*, 431 F. 2d 1097 (CA5 1970), cert. denied, 401 U. S. 948 (1971); *Young* v. *International Tel. & Tel. Co.*, 438 F. 2d 757 (CA3 1971); *Caldwell* v. *National Brewing Co.*, 443 F. 2d 1044 (CA5 1971), cert. denied, 405 U. S. 916 (1972); *Boudreaux* v. *Baton Rouge Marine Contracting Co.*, 437 F. 2d 1011 (CA5 1971).

employment discrimination[,] was first provided by the Civil Rights Acts of 1866 and 1871, 42 U. S. C. sections 1981, 1983. It was recently stated by the Supreme Court in the case of Jones v. Mayer, that these acts provide fundamental constitutional guarantees. In any case, the courts have specifically held that title VII and the Civil Rights Acts of 1866 and 1871 are not mutually exclusive, and must be read together to provide alternative means to redress individual grievances.

"Mr. President, the amendment of [Senator Hruska] will repeal the first major piece of civil rights legislation in this Nation's history. We cannot do that.

.        .        .        .        .

"The peculiarly damaging nature of employment discrimination is such that the individual, who is frequently forced to face a large and powerful employer, should be accorded every protection that the law has in its purview, and that the person should not be forced to seek his remedy in only one place." *Id.*, at 3371–3372.[11]

The Hruska amendment failed to win passage on a tied vote, *id.*, at 3373, and the Senate later defeated a motion to reconsider the amendment by a vote of 50 to 37, *id.*, at 3964–3965. Though the House initially adopted a similar amendment, 117 Cong. Rec. 31973, 32111 (1971), it eventually agreed with the Senate that Title VII should not preclude other remedies for employment discrimination, see H. R. Conf. Rep. No. 92–899 (1972). Thus, Congress in 1972 assumed that § 1981 reached private discrimination, and declined to alter its availability as an alternative to those remedies provided by Title VII. The Court in *Runyon* properly relied upon Congress' refusal to adopt an amendment that

---

[11] See also 118 Cong. Rec. 3370 (1972) (Sen. Javits) (opposing the Hruska amendment because it would "cut off . . . the possibility of using civil rights acts long antedating the Civil Rights Act of 1964 in a given situation which might fall, because of the statute of limitations or other provisions, in the interstices of the Civil Rights Act of 1964").

would have made § 1981 inapplicable to racially discriminatory actions by private employers, and concluded, as I do, that "[t]here could hardly be a clearer indication of congressional agreement with the view that § 1981 *does* reach private acts of racial discrimination." 427 U. S., at 174–175 (emphasis in original).

Events since our decision in *Runyon* confirm Congress' approval of our interpretation of § 1981. In 1976—shortly after the decision in *Runyon,* and well after the Court had indicated in *Tillman* and *Johnson* that § 1981 prohibits private discrimination—Congress reacted to the ruling in *Alyeska Pipeline Service Co.* v. *Wilderness Society,* 421 U. S. 240 (1975), that attorney's fees are not ordinarily recoverable absent statutory authorization, by enacting the Civil Rights Attorney's Fees Awards Act of 1976, Pub. L. 94–559, 90 Stat. 2641, 42 U. S. C. § 1988. A number of civil rights statutes, like § 1981, did not provide for the recovery of attorney's fees, and Congress heard testimony that the decision in *Alyeska Pipeline* might have a "devastating impact" on litigation under the civil rights laws. H. R. Rep. No. 94–1558, p. 3 (1976). Congress responded by passing an Act to permit the recovery of attorney's fees in civil rights cases, including those brought under § 1981.

Congress was well aware when it passed the 1976 Act that this Court had interpreted § 1981 to apply to private discrimination. The House Judiciary Committee Report had expressly stated:

> "Section 1981 is frequently used to challenge employment discrimination based on race or color. *Johnson* v. *Railway Express Agency, Inc.,* 421 U. S. 454 (1975). Under that section the Supreme Court recently held that whites as well as blacks could bring suit alleging racially discriminatory employment practices. *McDonald* v. *Santa Fe Trail Transportation Co.* [, 427 U. S. 273 (1976)]. Section 1981 has also been cited to attack exclusionary admissions policies at recreational facilities.

*Tillman* v. *Wheaton-Haven Recreation Assn., Inc.,* 410
U. S. 431 (1973)." *Id.,* at 4 (footnote omitted).
The House recognized that § 1981, thus interpreted, overlaps
significantly with Title VII, and expressed dissatisfaction
that attorney's fees should be available under the latter, but
not the former, statute. See also S. Rep. No. 94–1011, p. 4
(1976) ("[F]ees are now authorized in an employment dis-
crimination suit brought under Title VII of the 1964 Civil
Rights Act, but not in the same suit brought under 42
U. S. C. § 1981, which protects similar rights but involves
fewer technical prerequisites to the filing of an action").
Congress' action in providing for attorney's fees in § 1981 ac-
tions, intending that successful § 1981 plaintiffs who could
have brought their action under Title VII not be deprived of
fees, and knowing that this Court had interpreted § 1981 to
apply to private discrimination, goes beyond mere acquies-
cence in our interpretation of § 1981. Congress approved
and even built upon our interpretation. Overruling *Runyon*
would be flatly inconsistent with this expression of congres-
sional intent. See *Bob Jones University* v. *United States,*
461 U. S., at 601–602; *Patsy* v. *Board of Regents of Florida,*
457 U. S. 496, 501 (1982); *Apex Hosiery Co.* v. *Leader,* 310
U. S. 469, 488 (1940).

## II

I turn now to the two issues on which certiorari was origi-
nally requested and granted in this case. The first of these
is whether a plaintiff may state a cause of action under § 1981
based upon allegations that her employer harassed her be-
cause of her race. In my view, she may. The Court reaches
a contrary conclusion by conducting an ahistorical analysis
that ignores the circumstances and legislative history of
§ 1981. The Court reasons that Title VII or modern state
contract law "more naturally govern[s]" harassment actions,
*ante,* at 177—nowhere acknowledging the anachronism at-
tendant upon the implication that the Reconstruction Con-
gress would have viewed state law, or a federal civil rights

statute passed nearly a century later, as the primary basis for challenging private discrimination.

## A

The legislative history of § 1981—to which the Court does not advert—makes clear that we must not take an overly narrow view of what it means to have the "same right . . . to make and enforce contracts" as white citizens. The very same legislative history that supports our interpretation of § 1981 in *Runyon* also demonstrates that the 39th Congress intended, in the employment context, to go beyond protecting the freedmen from refusals to contract for their labor and from discriminatory decisions to discharge them. Section 1 of the Civil Rights Act was also designed to protect the freedmen from the imposition of working conditions that evidence an intent on the part of the employer not to contract on nondiscriminatory terms. See *supra*, at 194, and n. 4. Congress realized that, in the former Confederate States, employers were attempting to "adher[e], as to the *treatment of the laborers*, as much as possible to the traditions of the old system, *even where the relations between employers and laborers had been fixed by contract.*" Report of C. Schurz, S. Exec. Doc. No. 2, 39th Cong., 1st Sess., p. 19 (1865) (emphasis added). These working conditions included the use of the whip as an incentive to work harder—the commonplace result of an entrenched attitude that "[y]ou cannot make the negro work without physical compulsion," *id.*, at 16—and the practice of handing out severe and unequal punishment for perceived transgressions. See *id.*, at 20 ("The habit [of corporal punishment] is so inveterate with a great many persons as to render, on the least provocation, the impulse to whip a negro almost irresistible"). Since such "acts of persecution" against *employed* freedmen, *ibid.*, were one of the 39th Congress' concerns in enacting the Civil Rights Act, it is clear that in granting the freedmen the "same right . . . to make

and enforce contracts" as white citizens, Congress meant to encompass postcontractual conduct.

## B

The Court holds that § 1981, insofar as it gives an equal right to make a contract, "covers only conduct at the initial formation of the contract." *Ante,* at 179; see also *ante,* at 183. This narrow interpretation is not, as the Court would have us believe, *ante,* at 176–177, the inevitable result of the statutory grant of an equal right "to make contracts." On the contrary, the language of § 1981 is quite naturally read as extending to cover postformation conduct that demonstrates that the contract was not really made on equal terms at all. It is indeed clear that the statutory language of § 1981 imposes some limit upon the type of harassment claims that are cognizable under § 1981, for the statute's prohibition is against discrimination in the making and enforcement of contracts; but the Court mistakes the nature of that limit.[12] In my view, harassment is properly actionable under the language of § 1981 mandating that all persons "shall have the same right . . . to make . . . contracts . . . as is enjoyed by white citizens" if it demonstrates that the employer has in

_____

[12] The Court's overly narrow reading of the language of § 1981 is difficult to square with our interpretation of the equal right protected by § 1982 "to inherit, purchase, lease, sell, hold, and convey real and personal property" not just as covering the rights to acquire and dispose of property, but also the "right . . . to *use* property on an equal basis with white citizens," *Memphis* v. *Greene,* 451 U. S. 100, 120 (1981) (emphasis added), and "not to have property interests *impaired* because of . . . race," *id.,* at 122 (emphasis added).

In *Shaare Tefila Congregation* v. *Cobb,* 481 U. S. 615 (1987), we reversed the dismissal of a claim by a Jewish congregation alleging that individuals were liable under § 1982 for spraying racist graffiti on the walls of the congregation's synagogue. Though our holding in that case was limited to deciding that Jews are a group protected by § 1982, our opinion nowhere hints that the congregation's vandalism claim might not be cognizable under the statute because it implicated the use of property, and not its acquisition or disposal.

fact imposed discriminatory terms and hence has not allowed blacks to make a contract on an equal basis.

The question in a case in which an employee makes a § 1981 claim alleging racial harassment should be whether the acts constituting harassment were sufficently severe or pervasive as effectively to belie any claim that the contract was entered into in a racially neutral manner. Where a black employee demonstrates that she has worked in conditions substantially different from those enjoyed by similarly situated white employees, and can show the necessary racial animus, a jury may infer that the black employee has not been afforded the same right to make an employment contract as white employees. Obviously, as respondent conceded at oral argument, Tr. of Oral Arg. 30 (Feb. 29, 1987), if an employer offers a black and a white applicant for employment the same written contract, but then tells the black employee that her working conditions will be much worse than those of the white hired for the same job because "there's a lot of harassment going on in this workplace and you have to agree to that," it would have to be concluded that the white and black had not enjoyed an equal right to make a contract. I see no relevant distinction between that case and one in which the employer's different contractual expectations are unspoken, but become clear during the course of employment as the black employee is subjected to substantially harsher conditions than her white co-workers. In neither case can it be said that whites and blacks have had the same right to make an employment contract.[13] The Court's failure to consider such examples, and to explain the abundance of legislative history that con-

---

[13] I observe too that a company's imposition of discriminatory working conditions on black employees will tend to deter other black persons from seeking employment. "[W]hen a person is deterred, because of his race, from even entering negotiations, his equal opportunity to contract is denied as effectively as if he were discouraged by an offer of less favorable terms." Comment, Developments in the Law—Section 1981, 15 Harv. Civ. Rights-Civ. Lib. L. Rev. 29, 101 (1980).

founds its claim that § 1981 unambiguously decrees the result it favors, underscore just how untenable is the Court's position.[14]

Having reached its decision based upon a supposedly literal reading of § 1981, the Court goes on to suggest that its grudging interpretation of this civil rights statute has the benefit of not undermining Title VII. *Ante,* at 180–182. It is unclear how the interpretation of § 1981 to reach pervasive post-contractual harassment could be thought in any way to undermine Congress' intentions as regards Title VII. Congress has rejected an amendment to Title VII that would have rendered § 1981 unavailable as a remedy for employment discrimination, and has explicitly stated that § 1981 "protects similar rights [to Title VII] but involves fewer technical prerequisites to the filing of an action," see *supra,* at 205; that the Acts "provide alternative means to redress individual grievances," see *supra,* at 203; and that an employee who is discriminated against "should be accorded

---

[14] In *Meritor Savings Bank* v. *Vinson,* 477 U. S. 57 (1986), we addressed the question whether allegations of discriminatory workplace harassment state a claim under § 703 of Title VII, 42 U. S. C. § 2000e–2(a)(1), which prohibits discrimination "with respect to [an employee's] compensation, terms, conditions, or privileges of employment." We held that sexual harassment creating a hostile workplace environment may ground an action under Title VII. "[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII," however. 477 U. S., at 67. "For sexual harassment to be actionable it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Ibid.* Similarly, not all workplace conduct that may be described as racial harassment affects an employee's right to make contracts free of discrimination. But racial harassment of suffecent severity may impinge upon that right, as explained in the text, and should be actionable under § 1981.

Petitioner has never argued that the harassment she allegedly suffered amounted to a breach of an express or implied contract under state law, so this case presents no occasion to consider the United States' view that such a breach is actionable under § 1981 because it deprives a black employee of the same right to make contracts as a white person.

every protection that the law has in its purview, and . . . the person should not be forced to seek his remedy in only one place," *ibid.* Evidently, Title VII and § 1981 provide independent remedies, and neither statute has a preferred status that is to guide interpretation of the other. The Court, indeed, is forced to concede this fact, admitting that where the statutes overlap "we are not at liberty 'to infer any positive preference for one over the other.'" *Ante*, at 181. But the Court then goes on to say that the existence of Title VII "should lessen the temptation for this Court to twist the interpretation of [§ 1981] to cover the same conduct." *Ibid.* This, of course, brings us back to the question of what § 1981, properly interpreted, means. The Court's lengthy discussion of Title VII adds nothing to an understanding of that issue.

The Court's use of Title VII is not only question begging; it is also misleading. Section 1981 is a statute of general application, extending not just to employment contracts, but to *all* contracts. Thus we have held that it prohibits a private school from applying a racially discriminatory admissions policy, *Runyon*, and a community recreational facility from denying membership based on race, *Tillman*. The lower federal courts have found a broad variety of claims of contractual discrimination cognizable under § 1981. *E. g.,* *Wyatt* v. *Security Inn Food & Beverage, Inc.*, 819 F. 2d 69 (CA4 1987) (discriminatory application of hotel bar's policy of ejecting persons who do not order drinks); *Hall* v. *Bio-Medical Application, Inc.*, 671 F. 2d 300 (CA8 1982) (medical facility's refusal to treat black person potentially cognizable under § 1981); *Hall* v. *Pennsylvania State Police*, 570 F. 2d 86 (CA3 1978) (bank policy to offer its services on different terms dependent upon race); *Cody* v. *Union Electric*, 518 F. 2d 978 (CA8 1975) (discrimination with regard to the amount of security deposit required to obtain service); *Howard Security Services, Inc.* v. *Johns Hopkins Hospital*, 516 F. Supp. 508 (Md. 1981) (racially discriminatory award of contract to

supply services); *Grier* v. *Specialized Skills, Inc.*, 326 F. Supp. 856 (WDNC 1971) (discrimination in admissions to barber school); *Scott* v. *Young*, 307 F. Supp. 1005 (ED Va. 1969) (discrimination in amusement park admissions policy), aff'd, 421 F. 2d 143 (CA4), cert. denied, 398 U. S. 929 (1970). The Court, however, demonstrates no awareness at all that § 1981 is so much broader in scope than Title VII, instead focusing exclusively upon the claim that its cramped construction of § 1981 "preserve[s] the integrity of Title VII's procedures," *ante*, at 181, and avoids "[u]nnecessary overlap" that would "upset the delicate balance between employee and employer rights struck by Title VII," *ante*, at 182, n. 4. Rights as between an employer and employee simply are not involved in many § 1981 cases, and the Court's restrictive interpretation of § 1981, minimizing the overlap with Title VII, may also have the effect of restricting the availability of § 1981 as a remedy for discrimination in a host of contractual situations to which Title VII does not extend.

Even as regards their coverage of employment discrimination, § 1981 and Title VII are quite different. As we have previously noted, "the remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent." *Johnson*, 421 U. S., at 461. Perhaps most important, § 1981 is not limited in scope to employment discrimination by businesses with 15 or more employees, cf. 42 U. S. C. § 2000e(b), and hence may reach the nearly 15% of the workforce not covered by Title VII. See Eisenberg & Schwab, The Importance of Section 1981, 73 Cornell L. Rev. 596, 602 (1988). A § 1981 backpay award may also extend beyond the 2-year limit of Title VII. *Johnson*, 421 U. S., at 460. Moreover, a § 1981 plaintiff is not limited to recovering backpay: she may also obtain damages, including punitive damages in an appropriate case. *Ibid.* Other differences between the two statutes include the right to a jury trial under § 1981, but not Title VII; a different statute of limitations in

§ 1981 cases, see *Goodman* v. *Lukens Steel Co.*, 482 U. S. 656 (1987); and the availability under Title VII, but not § 1981, of administrative machinery designed to provide assistance in investigation and conciliation, see *Johnson, supra*, at 460.[15] The fact that § 1981 provides a remedy for a type of racism that remains a serious social ill broader than that available under Title VII hardly provides a good reason to see it, as the Court seems to, as a disruptive blot on the legal landscape, a provision to be construed as narrowly as possible.

## C

Applying the standards set forth above, I believe the evidence in this case brings petitioner's harassment claim firmly within the scope of § 1981. Petitioner testified at trial that during her 10 years at McLean she was subjected to racial slurs; given more work than white employees and assigned the most demeaning tasks; passed over for promotion, not informed of promotion opportunities, and not offered training

---

[15] The Court suggests that overlap between § 1981 and Title VII interferes with Title VII's mediation and conciliation procedures. *Ante*, at 180–182, and n. 4. In *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S., at 461, however, we rejected a suggestion that the need for Title VII procedures to continue unimpeded by collateral litigation required that the timely filing of a discrimination charge with the EEOC toll the limitation period for § 1981:

"Conciliation and persuasion through the administrative process . . . often constitute a desirable approach to settlement of disputes based on sensitive and emotional charges of invidious employment discrimination. We recognize, too, that the filing of a lawsuit might tend to deter efforts at conciliation, that a lack of success in the legal action could weaken the [EEOC's] efforts to induce voluntary compliance, and that suit is privately oriented and narrow, rather than broad, in application, as successful conciliation tends to be. *But these are the natural effects of the choice Congress has made available to the claimant by its conferring upon him independent administrative and judicial remedies.* The choice is a valuable one. Under some circumstances, the administrative route may be highly preferred over the litigatory; under others, the reverse may be true." (Emphasis added.)

for higher level jobs; denied wage increases routinely given other employees; and singled out for scrutiny and criticism.

Robert Stevenson, the general manager and later president of McLean, interviewed petitioner for a file clerk position in 1972. At that time he warned her that all those with whom she would be working were white women, and that they probably would not like working with a black. Tr. 1–19. In fact, however, petitioner testified that it was Stevenson and her supervisors who subjected her to racial harassment, rather than her co-workers. For example, petitioner testified that Stevenson told her on a number of occasions that "blacks are known to work slower than whites by nature," *id.*, at 1–87 to 1–88, 2–80 to 2–81, or, as he put it in one instance, that "some animals [are] faster than other animals." *Id.*, at 2–83. Stevenson also repeatedly suggested that a white would be able to do petitioner's job better than she could. *Id.*, at 1–83.[16]

Despite petitioner's stated desire to "move up and advance" at McLean to an accounting or secretarial position, *id.*, at 1–22, she testified that she was offered no training for a higher level job during her entire tenure at the credit union. *Id.*, at 1–25. White employees were offered training, *id.*, at 1–93, including a white employee at the same level as petitioner but with less seniority. That less senior white employee was eventually promoted to an intermediate accounting clerk position. *Id.*, at 1–48 to 1–49, 2–114 to 2–115. As with every other promotion opportunity that occurred, petitioner was never informed of the opening. *Id.*, at 1–46, 1–91 to 1–92. During the 10 years petitioner worked for McLean, white persons were repeatedly hired for more se-

---

[16] A former manager of data processing for McLean testified that when he recommended a black person for a position as a data processor, Stevenson criticized him, saying that he did not "need any more problems around here," that he would interview the person, but not hire him, and that he would then "search for additional people who are not black." Tr. 2–160 to 2–161.

nior positions, without any notice of these job openings being posted, and without petitioner ever being informed of, let alone interviewed for, any of these opportunities. *Id.*, at 1–93 to 1–97. Petitioner claimed to have received different treatment as to wage increases as well as promotion opportunities. Thus she testified that she had been denied a promised pay raise after her first six months at McLean, though white employees automatically received pay raises after six months. *Id.*, at 1–84 to 1–85. See also *id.*, at 1–60 to 1–65 (denial of merit increase).

Petitioner testified at length about allegedly unequal work assignments given by Stevenson and her other supervisors, *id.*, at 1–27 to 1–28, 1–30, and detailed the extent of her work assignments. *Id.*, at 1–31, 1–101 to 1–120, 2–18, 2–119 to 2–121. When petitioner complained about her workload, she was given no help with it. *Id.*, at 1–82 to 1–83. In fact, she was given more work and was told she always had the option of quitting. *Id.*, at 1–29. Petitioner claimed that she was also given more demeaning tasks than white employees and was the only clerical worker who was required to dust and to sweep. *Id.*, at 1–31. She was also the only clerical worker whose tasks were not reassigned during a vacation. Whenever white employees went on vacation, their work was reassigned; but petitioner's work was allowed to accumulate for her return. *Id.*, at 1–37, 1–87.

Petitioner further claimed that Stevenson scrutinized her more closely and criticized her more severely than white employees. Stevenson, she testified, would repeatedly stare at her while she was working, although he would not do this to white employees. *Id.*, at 1–38 to 1–39, 1–90 to 1–91. Stevenson also made a point of criticizing the work of white employees in private, or discussing their mistakes at staff meetings without attributing the error to a particular individual. But he would chastise petitioner and the only other black employee publicly at staff meetings. *Id.*, at 1–40, 1–89 to 1–90, 2–72 to 2–73.

The defense introduced evidence at trial contesting each of these assertions by petitioner. But given the extent and nature of the evidence produced by Patterson, and the importance of credibility determinations in assigning weight to that evidence, the jury may well have concluded that petitioner was subjected to such serious and extensive racial harassment as to have been denied the right to make an employment contract on the same basis as white employees of the credit union.[17]

## III

I agree that the District Court erred when it instructed the jury as to petitioner's burden in proving her claim that McLean violated § 1981 by failing to promote her, because she is black, to an intermediate accounting clerk position. The District Court instructed the jury that Patterson had to prove not only that she was denied a promotion because of her race, but also that she was better qualified than the white employee who had allegedly received the promotion. That instruction is inconsistent with the scheme of proof we have carefully designed, in analogous cases, "to bring the litigants and the court expeditiously and fairly to [the] ultimate question" whether the defendant intentionally discriminated against the plaintiff. *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248, 253 (1981).

A § 1981 plaintiff must prove purposeful discrimination. *General Building Contractors Assn., Inc.* v. *Pennsylvania,* 458 U. S., at 391. Where the ultimate issue in a disparate-treatment action is whether the defendant intentionally discriminated against the plaintiff, a well-established framework of proof applies if the plaintiff offers only indirect evidence of discriminatory motive. See *McDonnell Douglas*

---

[17] The proposed jury instruction quoted by the Court, *ante,* at 179, is scarcely conclusive as to the nature of Patterson's harassment claim. Indeed, it is precisely harassment so pervasive as to create a discriminatory work environment that will demonstrate that a black plaintiff has been denied an opportunity to contract on equal terms with white employees.

*Corp.* v. *Green*, 411 U. S. 792 (1973) (Title VII); *Dister* v. *The Continental Group, Inc.*, 859 F. 2d 1108 (CA2 1988) (discriminatory interference with right to benefits, in violation of § 510 of the Employee Retirement Income Security Act of 1974, 29 U. S. C. § 1140); *Loeb* v. *Textron, Inc.*, 600 F. 2d 1003 (CA1 1979) (violation of the Age Discrimination in Employment Act, 29 U. S. C. § 621 *et seq.*). There is no reason why this scheme of proof, carefully structured as a "sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination," *Furnco Construction Corp.* v. *Waters*, 438 U. S. 567, 577 (1978), should not apply to claims of racial discrimination under § 1981. Indeed, the Court of Appeals held below that "[t]he disparate treatment proof scheme developed for Title VII actions in *McDonnell Douglas Corp.* v. *Green, [supra,]* and its progeny, may properly be transposed, as here, to the jury trial of a § 1981 claim." 805 F. 2d 1143, 1147 (CA4 1986). The courts below erred, however, in identifying a § 1981 plaintiff's burden under that framework.

A black plaintiff claiming that an employment decision infringed her § 1981 right to make and enforce contracts on the same terms as white persons has the initial burden of establishing a prima facie case. This burden is not an onerous one. *Burdine, supra,* at 253. The plaintiff need only prove by a preponderance of the evidence that she applied for an available position for which she was qualified, see *supra,* at 213–214, that she was rejected, and that the employer either continued to seek applicants for the position, or, as allegedly occurred in this case, filled the position with a white employee, see *McDonnell Douglas, supra,* at 802; *Burdine, supra,* at 253. We have required at this stage proof only that a plaintiff was qualified for the position she sought, not proof that she was better qualified than other applicants. See *McDonnell Douglas, supra,* at 802; *Burdine, supra,* at 253, n. 6. Proof sufficient to make out a prima facie case raises a presumption that the employer acted for impermissi-

ble reasons, see *Furnco Construction Corp., supra*, at 577, which the employer may then rebut by articulating "some legitimate, nondiscriminatory reason for the employee's rejection," *McDonnell Douglas, supra*, at 802.

In this case, in addition to attacking petitioner's claim to have made out a prima facie case, respondent introduced evidence tending to show that if it promoted a white employee over petitioner, it did so because the white employee was better qualified for the job. This evidence rebutted any presumption of discrimination raised by petitioner's prima facie case. Our cases make it clear, however, that a plaintiff must have the opportunity to introduce evidence to show that the employer's proffered reasons for its decision were not its true reasons. It is equally well established that this evidence may take a variety of forms. *McDonnell Douglas, supra*, at 804–805; *Furnco Construction Corp., supra*, at 578. Though petitioner *might* have sought to prove that McLean's claim to have promoted a better qualified applicant was not its true reason by showing she was in fact better qualified than the person promoted, the District Court erred in instructing the jury that to succeed petitioner was *required* to make that showing. Such an instruction is much too restrictive, cutting off other methods of proving pretext plainly recognized in our cases. We suggested in *McDonnell Douglas*, for example, that a black plaintiff might be able to prove pretext by showing that the employer has promoted white employees who lack the qualifications the employer relies upon, or by proving the employer's "general policy and practice with respect to minority employment." 411 U. S., at 804–805. And, of particular relevance given petitioner's evidence of racial harassment and her allegation that respondent failed to train her for an accounting position because of her race, we suggested that evidence of the employer's past treatment of the plaintiff would be relevant to a showing that the employer's proffered legitimate reason was not its true reason. *Id.*, at 804. There are innumerable dif-

ferent ways in which a plaintiff seeking to prove intentional discrimination by means of indirect evidence may show that an employer's stated reason is pretextual and not its real reason. The plaintiff may not be forced to pursue any one of these in particular.[18]

I therefore agree that petitioner's promotion discrimination claim must be remanded because of the District Court's erroneous instruction as to petitioner's burden. It seems to me, however, that the Court of Appeals was correct when it said that promotion-discrimination claims are cognizable under § 1981 because they "go to the very existence and nature of the employment contract." 805 F. 2d, at 1145. The Court's disagreement with this commonsense view, and its statement that "the question whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer," *ante*, at 185, display nicely how it seeks to eliminate with technicalities the protection § 1981 was intended to afford—to limit protection to the form of the contract entered into, and not to extend it, as Congress intended, to the substance of the contract as it is worked out in practice. Under the Court's view, the employer may deny any number of promotions solely on the basis of race, safe from a § 1981 suit, provided it is careful that promotions do not involve new contracts.

---

[18] The Court of Appeals mistakenly held that the instruction requiring petitioner to prove her superior qualifications was necessary in order to protect the employer's right to choose among equally well-qualified applicants. As we stated in *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248, 259 (1981): "[T]he employer has discretion to choose among equally qualified candidates, *provided the decision is not based upon unlawful criteria.*" (Emphasis added.) Where a plaintiff proves that an employer's purported reasons for a promotion decision were all pretextual, the factfinder may infer that the employer's decision was *not* based upon lawful criteria; and, as I point out in the text, there are many ways in which a plaintiff can prove pretext other than by proving her superior qualifications.

It is admittedly difficult to see how a "promotion"—which would seem to imply different duties and employment terms — could be achieved without a new contract, and it may well be as a result that promotion claims will always be cognizable under § 1981. Nevertheless, the same criticisms I have made of the Court's decision regarding harassment claims apply here: proof that an employee was not promoted because she is black—while all around white peers are advanced—shows that the black employee has in substance been denied the opportunity to contract on the equal terms that § 1981 guarantees.

## IV

In summary, I would hold that the Court of Appeals erred in deciding that petitioner's racial harassment claim is not cognizable under § 1981. It likewise erred in holding that petitioner could succeed in her promotion-discrimination claim only by proving that she was better qualified for the position of intermediate accounting clerk than the white employee who was in fact promoted.

JUSTICE STEVENS, concurring in the judgment in part and dissenting in part.

When I first confronted the task of interpreting § 1981, I was persuaded by Justice Cardozo's admonition that it is wise for the judge to " 'lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him.' " *Runyon* v. *McCrary*, 427 U. S. 160, 191 (1976) (concurring opinion) (quoting B. Cardozo, The Nature of the Judicial Process 149 (1921)). The Court had already construed the statutory reference to the right "to make and enforce contracts" as a guarantee of equal opportunity, and not merely a guarantee of equal rights. Today the Court declines its own invitation to tear down that foundation and begin to build a different legal structure on its original text. I agree, of course, that *Runyon* should not be overruled. I am also persuaded, however, that the meaning that had already been

given to "the same right . . . to make and enforce contracts" that "is enjoyed by white citizens"—the statutory foundation that was preserved in *Runyon*—encompasses an employee's right to protection from racial harassment by her employer.

In *Runyon* we held that § 1981 prohibits a private school from excluding qualified children because they are not white citizens. Just as a qualified nonwhite child has a statutory right to equal access to a private school, so does a nonwhite applicant for employment have a statutory right to enter into a personal service contract with a private employer on the same terms as a white citizen. If an employer should place special obstacles in the path of a black job applicant—perhaps by requiring her to confront an openly biased and hostile interviewer—the interference with the statutory right to make contracts to the same extent "as is enjoyed by white citizens" would be plain.

Similarly, if the white and the black applicants are offered the same terms of employment with just one exception—that the black employee would be required to work in dark, uncomfortable surroundings, whereas the white employee would be given a well-furnished, two-window office—the discrimination would be covered by the statute. In such a case, the Court would find discrimination in the making of the contract because the disparity surfaced before the contract was made. See *ante*, at 176–177, 179, 180, 184. Under the Court's understanding of the statute, the black applicant might recover on one of two theories: She might demonstrate that the employer intended to discourage her from taking the job—which is the equivalent of a "refusal to enter into a contract"—or she might show that the employer actually intended to enter a contract, but "only on discriminatory terms." *Ante*, at 177. Under the second of these theories of recovery, however, it is difficult to discern why an employer who makes his intentions known has discriminated in the "making" of a contract, while the employer who conceals his discriminatory intent until after the applicant has ac-

cepted the job, only later to reveal that black employees are intentionally harassed and insulted, has not.

It is also difficult to discern why an employer who does not decide to treat black employees less favorably than white employees until after the contract of employment is first conceived is any less guilty of discriminating in the "making" of a contract. A contract is not just a piece of paper. Just as a single word is the skin of a living thought, so is a contract evidence of a vital, ongoing relationship between human beings. An at-will employee, such as petitioner, is not merely performing an existing contract; she is constantly remaking that contract. Whenever significant new duties are assigned to the employee—whether they better or worsen the relationship—the contract is amended and a new contract is made. Thus, if after the employment relationship is formed, the employer deliberately implements a policy of harassment of black employees, it has imposed a contractual term on them that is not the "same" as the contractual provisions that are "enjoyed by white citizens." Moreover, whether employed at will or for a fixed term, employees typically strive to achieve a more rewarding relationship with their employers. By requiring black employees to work in a hostile environment, the employer has denied them the same opportunity for advancement that is available to white citizens. A deliberate policy of harassment of black employees who are competing with white citizens is, I submit, manifest discrimination in the making of contracts in the sense in which that concept was interpreted in *Runyon* v. *McCrary, supra.* I cannot believe that the decision in that case would have been different if the school had agreed to allow the black students to attend, but subjected them to segregated classes and other racial abuse.

Indeed, in *Goodman* v. *Lukens Steel Co.*, 482 U. S. 656 (1987), we built further on the foundation laid in *Runyon*. We decided that a union's "toleration and tacit encouragement of racial harassment" violates § 1981. 482 U. S., at

665.   Although the Court now explains that the *Lukens* decision rested on the union's interference with its members' right to enforce their collective-bargaining agreement, see *ante*, at 177–178, 183, when I joined that opinion I thought—and I still think—that the holding rested comfortably on the foundation identified in *Runyon*.   In fact, in the section of the *Lukens* opinion discussing the substantive claim, the Court did not once use the term "enforce" or otherwise refer to that particular language in the statute.   482 U. S., at 664–669.

The Court's repeated emphasis on the literal language of § 1981 might be appropriate if it were building a new foundation, but it is not a satisfactory method of adding to the existing structure.   In the name of logic and coherence, the Court today adds a course of bricks dramatically askew from "the secure foundation of the courses laid by others," replacing a sense of rational direction and purpose in the law with an aimless confinement to a narrow construction of what it means to "make" a contract.

For the foregoing reasons, and for those stated in Parts II–B and II–C of JUSTICE BRENNAN's opinion, I respectfully dissent from the conclusion reached in Part III of the Court's opinion.   I also agree with JUSTICE BRENNAN's discussion of the promotion claim.