**Sandra L. WILBORN, Plaintiff,**

v.

**PRIMARY CARE SPECIALISTS, LTD., Karen Rose, and Robert Tetik, M.D., Defendants.**

No. 93 C 5505.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 26, 1994.

As Amended Oct. 13, 1994.

Fed.R.Civ.P. 30(b)(6) will be found to represent its interests for purposes of Fed.R.Civ.P. 32(a)(2).

Howard B. Brookins, Jr., Steven Gregory Watkins, Roderick T. Sawyer, Watkins & Sawyer, Chicago, IL, for plaintiff Sandra L. Wilborn.

Michael H. Moirano, Charles Anthony Packard, Nisen & Elliott, Chicago, IL, for defendants Emsco II, Ltd., Robert Tetik, M.D., Primary Care Specialists, Ltd., a subsidiary of Emsco, Inc., Emsco, Inc.

Charles Anthony Packard, Gregory Canard Ward, Nisen & Elliott, Chicago, IL, for defendant Emsco Management Services, Inc.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

On August 25, 1994, the Court held a bench trial in this matter. Thereafter, the Court considered the written closing arguments submitted by each party. The Court hereby enters the following Findings of Fact and Conclusions of Law. The Findings of Fact are based upon consideration of all the admissible evidence as well as this Court's assessment of the credibility of the trial witnesses.

### FINDINGS OF FACT

1. On November 4, 1991, Plaintiff Sandra Wilborn ("Wilborn") was hired by Primary Care Specialists, Ltd. ("Primary Care") to serve as a Marketing Representative. Ms. Wilborn is of African–American descent.

2. Defendant Primary Care, during all relevant times, operated a health care clinic under the name of First Care Clinic ("the Clinic") at 1158 W. Taylor Street, Chicago, Illinois.

3. Ms. Wilborn executed a written employment agreement with Primary Care on November 4, 1991. (Plaintiff's Ex. A). Pursuant to this agreement, Ms. Wilborn's annual compensation was $35,000 per year with an annual bonus equal to five percent (5%) of Primary Care's net increase in gross receipts for each contract year. The agreement was of unlimited duration subject to its termi-

nation provisions. This agreement was signed by Primary Care's President—Dr. Robert D. Tetik, a named non-minority defendant in this case.

4. Paragraph 9 of Ms. Wilborn's employment agreement allowed Primary Care to terminate her employment upon 7 days notice for cause and upon 30 days notice without cause.

5. During her employment at Primary Care, Ms. Wilborn was able to successfully solicit new clients and expand the business of the Clinic.

6. Plaintiff's supervisor was Dr. Robert Knapp, the Clinic's Medical Director, who is deceased and whose testimony was not available at trial.

7. Shortly after Ms. Wilborn started working at Primary Care, Ms. Karen Rose (a named non-minority defendant in this case) was hired to serve as the Office Manager of Primary Care. Although Ms. Rose had no apparent official supervisory authority over Ms. Wilborn, Ms. Wilborn did report to Ms. Rose with respect to "client service" issues.

8. On November 27, 1991, Ms. Rose distributed a list of forty-three (43) racially derogatory jokes about African–Americans to Ms. Wilborn. (Plaintiff's Ex. J). Thereafter, Ms. Wilborn complained about this matter to Dr. Robert Tetik and faxed a copy of these jokes to Dr. Tetik. Ms. Wilborn also complained about this matter to the Clinic's Medical Director, Dr. Robert Knapp.

9. Ms. Rose was formally disciplined for the November 27, 1991 incident and was the subject of a formal "Behavior/Performance Counseling Report." (Defendants' Ex. 3). Primary Care handled personnel issues through a part-time consultant, Sue Waxstein, who testified that Ms. Rose was warned never to repeat this incident. Ms. Waxstein is employed as the Director of Human Resources for a counseling company called EMSCO Management Services. Ms. Waxstein's report stated that Ms. Rose's behavior was "most inappropriate behavior for a supervisor and showed very poor judgment." (Defendants' Ex. 3). Nevertheless, Primary Care allowed Ms. Rose and Ms. Wilborn to work together without any clear lines of authority between their respective Marketing Representative and Office Manager positions.

10. From November 28, 1991 until January 2, 1992, Ms. Wilborn worked at Primary Care without incident.

11. On January 3, 1992, Ms. Wilborn and Ms. Rose had a disagreement about client relations issues involving the Bulk Mail Center. These issues were documented in a memorandum sent by Ms. Wilborn to Dr. Tetik on January 7, 1992. (Plaintiff's Ex. K).

12. The January 3, 1992 incident forms the fundamental basis for events which gave rise to this lawsuit. The incident was the subject of a formal "Behavior/Performance Counseling Report" which was prepared by Ms. Waxstein and issued to Ms. Wilborn. Although the dispute involved both Ms. Rose and Ms. Wilborn, only Ms. Wilborn was issued a counseling report. The report indicated that Ms. Wilborn had lost her temper and had raised her voice in front of patients and staff. The report further stated that "the staff were concerned with [Ms. Wilborn's] behavior and approached Dr. Polk and Karen Rose with their concerns." (Plaintiff's Ex. C). Despite the fact that Ms. Wilborn had never experienced any prior behavioral problems at the Clinic, the report concluded that "[f]uture behavioral problems will lead to further disciplinary actions and possible termination." (*Id.*).

13. No probative evidence was presented at trial which showed that Ms. Rose was disciplined in any way for her role in the January 3, 1992 incident despite the fact that Primary Care was well aware of the prior November 27, 1991 incident involving Ms. Rose and Ms. Wilborn, in which Ms. Rose "showed very poor judgment." (Defendants' Ex. 3).

14. On January 10, 1992, Ms. Wilborn met with her supervisor Dr. Knapp and Sue Waxstein to discuss the January 7, 1992 "Behavior/Performance Counseling Report" which related to the January 3, 1992 incident. This meeting is documented in a January 10, 1992 memorandum prepared by Ms. Waxstein. (Plaintiff's Ex. D).

15. According to Ms. Wilborn, whose testimony this Court expressly credits, she hoped that the January 10, 1992 meeting would resolve the ongoing problems she was having at the Clinic with her supervisor Dr. Knapp and Ms. Rose. Specifically, Ms. Wilborn complained that Dr. Knapp continually undercut her position during meetings with the Clinic's clients despite her position as the Clinic's Marketing Representative. During this meeting it became evident to Ms. Wilborn that her adverse employment conditions would not be addressed and she resolved to file a discrimination suit.

16. Ms. Wilborn's expressed desire to file a discrimination suit is well documented in Ms. Waxstein's January 10, 1992 memorandum. (Plaintiff's Ex. D). This memo indicated:

> [Ms. Wilborn] agreed to sign the Counseling Report, but stated several times that she was planning to immediately file a discrimination suit against us. I explained that a reprimand for arguing with a co-worker in front of others is not an act of discrimination.
>
> Efforts were continually made by [Ms. Wilborn] to focus the discussion on other issues, i.e., co-workers' incompetence, personality conflicts, and lack of communication. She did finally acknowledge her inappropriate behavior; she again stated she would file a discrimination suit against us in any case and left.

(*Id.*).

17. Ms. Wilborn immediately left the January 10, 1992 meeting with Dr. Knapp and Ms. Waxstein and attempted to file a complaint with the Illinois Department of Human Rights. However, by the time she reached the Commission's offices it was 4:30 p.m. and no one was available to process her complaint. The next day, Ms. Wilborn apparently prepared an intake worksheet. A formal discrimination charge was eventually prepared by the Department of Human Rights on or about January 28, 1992. (Plaintiff's Ex. L). Ms. Wilborn's formal charge of discrimination outlined a pattern of discriminatory conduct which was consistent with her trial testimony.

18. On January 20, 1992, Ms. Wilborn was called into a meeting with Dr. Knapp, Dr. Tetik and Ms. Waxstein. At that time, Ms. Wilborn was presented with a "Counseling Report" dated January 16, 1992 which had been prepared by Ms. Waxstein. (Plaintiff's Ex. F). The typed portion of this statement read as follows:

> On Friday, 1/10/92, Susan Waxstein and Dr. Knapp met with Sandra Wilborn to discuss an incident which occurred on 1/7/92. Sandra was told that her unprofessional behavior had caused concern among some of the staff.
>
> Subsequent to this meeting, Sandra began questioning the First Care staff to find out who had commented on her behavior. She called Susan Waxstein and told her that the staff denied approaching the Clinic Manager or the Clinic Physician and that further investigation was warranted. Susan agreed to look into the matter and asked Sandra for documentation from the staff verifying her claims.
>
> Sandra went back to the staff and in at least two instances, told staff members that Dr. Tetik wanted the signed statements from the employees and that if they refused to sign, Dr. Tetik would come to the clinic and personally make them sign. Those employees felt intimidated and coerced. They did not want to be involved, but felt they had no choice.
>
> Additionally, Sandra showed the counseling report regarding her behavior to at least two staff members, revealing a confidential discussion and told at least two staff members that she planned to file a discrimination suit against the company, causing even further disruption and apprehension at the clinic.

(*Id.*)

The handwritten portion of this document, which immediately followed the above-quoted text and was continued in a section of the report entitled "Consequences/Action Plan," stated the following:

> Due to the severity of the above and [Ms. Wilborn's] unwillingness and inability to help us to solve these problems, [Ms. Wilborn] is to be terminated immediately due to dishonesty, revealing confidential infor-

mation to staff members and further disrupting and de-motivating the staff. (Plaintiff's Ex. F). This "Counseling Report" was signed by Dr. Knapp and Dr. Tetik on January 20, 1992. (*Id.*).

19. Between January 10 and January 16, 1992, Ms. Wilborn and Ms. Waxstein had conversations relating to alleged complaints made against Ms. Wilborn by her fellow employees pertaining to the initial January 3, 1992 incident. In particular, Ms. Wilborn told Ms. Waxstein that she was the victim of racial discrimination. Ms. Waxstein directed Ms. Wilborn to put her concerns in writing so that they could be evaluated by Dr. Tetik. Ms. Wilborn interpreted this direction to require her to obtain written proof that her fellow employees were not adversely affected by her actions on January 3, 1992.

20. After Ms. Wilborn was provided with the January 7, 1992 "Behavior/Performance Counseling Report" (Plaintiff's Ex. C), she contacted several of her fellow employees and determined that they had not overheard the January 3, 1992 incident between her and Ms. Rose. Ms. Wilborn contacted her fellow employees in an attempt to show that Dr. Knapp's January 7, 1992 "Behavior/Performance Counseling Report" was false. Thereafter, Ms. Wilborn faxed two different documents to Ms. Waxstein in an effort to show that a significant number of Clinic employees had not complained about her behavior to Dr. Knapp. (Plaintiff's Exs. Q & R). Ms. Waxstein never warned Ms. Wilborn that it might be improper to contact her fellow employees about the January 3, 1992 incident. In fact, Ms. Waxstein admitted that she told Ms. Wilborn to send her something in writing to confirm that other employees denied talking to Dr. Knapp.

21. On January 16, 1992, Ms. Waxstein conducted an investigation into Ms. Wilborn's discrimination complaints. This investigation is documented in a memorandum which was prepared on the same date by Ms. Waxstein. (Defendants' Ex. 7). This document indicates that only two out of four clinic employees heard the January 3, 1992 argument between Ms. Rose and Ms. Wilborn. However, only one employee heard any of the actual words between Ms. Rose and Ms. Wilborn.

This sole employee, Lolita Fox, reported that she heard Ms. Rose tell Ms. Wilborn: "You should keep your nose out of my business." (Defendants' Ex. 7). Ms. Rose also admitted to Ms. Waxstein that she "wanted to kill her," referring to Ms. Wilborn. (Defendants' Ex. 7).

22. Despite the fact that Ms. Waxstein's investigation uncovered a great deal of negative information about Ms. Rose, no disciplinary action was taken against Ms. Rose. In particular, Dr. Polk, a Clinic doctor, informed Ms. Waxstein that Ms. Rose's weakness was "people management" and that Ms. Rose needed training in this area. (Defendants' Ex. 7).

23. On January 17, 1992, Ms. Wilborn sent a memorandum to Dr. Tetik which expressed her concerns about Dr. Knapp's unprofessional behavior with Clinic clients. (Plaintiff's Ex. O).

24. On January 20, 1992, Dr. Knapp, Dr. Tetik and Ms. Waxstein met with Ms. Wilborn to review the results of Ms. Waxstein's evaluation. This meeting was also the subject of a memorandum authored by Ms. Waxstein. (Defendants' Ex. 9). This document expressly mentions Ms. Wilborn's "plans to file a discrimination suit." (Defendants' Ex. 9). This document expressly indicated that Ms. Wilborn would be terminated for three specific reasons: "(1) dishonesty (telling employees that Dr. Tetik had asked for signed statements and would make employees sign them); (2) revealing the contents of a confidential counseling discussion report; (3) disrupting staff/clinic operations and further deteriorating staff morale." (Defendants' Ex. 9).

This memorandum concludes with the following paragraph:

[Ms. Wilborn] was told that had she simply accepted the counseling report and not further exacerbated the situation by disrupting the staff and questioning and intimidating fellow employees, the incident would have been dropped with the discussion of 1/10/92. [Ms. Wilborn] created the problem by contacting Dr. Tetik, staff members and Susan Waxstein and requesting further investigations. The in-

vestigation revealed the intimidation, lies and unprofessionalism of her behavior. (Defendants' Ex. 9).

25. After her January 20, 1992 dismissal from the Clinic, Ms. Wilborn was unemployed less than one year. On May 5, 1992, she was offered a position as First Care Clinic Manager at a salary of $35,000 per year. (Plaintiff's Ex. I). Dr. Tetik also subsequently hired Ms. Wilborn to work as a marketing consultant for one of the Clinic's large client referrals.

26. Karen Rose's position at the Clinic was eventually terminated after Ms. Wilborn left. Thereafter, Ms. Wilborn was offered Ms. Rose's former job.

27. On April 15, 1992 Ms. Wilborn received a check for one week's pay in lieu of seven days notice of termination pursuant to Section 9A of her employment agreement with Primary Care. (Defendants' Ex. 10).

28. On June 8, 1992, Ms. Wilborn commenced her reemployment with Primary Care as the First Care Clinic Manager at a salary of $35,000 per year. Ms. Wilborn also retained her original seniority rights and her prior job benefits were reinstated. (Defendants' Ex. 12).

### *CONCLUSIONS OF LAW*

1. The Court finds as a matter of law that a retaliatory action taken against an employee as a result of the employee's filing of a race discrimination claim before a federal, state or local agency is actionable under 42 U.S.C. § 1981. After the Supreme Court decided *Patterson v. McLean Credit Union*, 491 U.S. 164, 177, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989) (holding that section 1981's protections do not extend "to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions"), Congress passed the Civil Rights Act of 1991, P.L. 102–166, 105 Stat. 1071, which was specifically intended to legislatively overrule *Patterson*. *See* H.R.Rep. No. 40(I), 102d Cong., 1st. Sess., at 89–93 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 627–631. Significantly, Congress noted that *Patterson* had been "in-

terpreted to eliminate retaliation claims that the courts had previously recognized under section 1981," *id.* at 92 n. 92, U.S.C.C.A.N. at 630 n. 92, and the legislative history explicitly states that the Act "would restore rights to sue for such retaliatory conduct." *Id.*

Prior to *Patterson*, all circuits that specifically addressed the issue held that retaliation by an employer following an employee's filing of a race discrimination claim—or otherwise protesting discriminatory employment conditions—is actionable under section 1981. *See, e.g., Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 503 (9th Cir.1989); *Greenwood v. Ross*, 778 F.2d 448, 455 (8th Cir.1985); *Choudhury v. Polytechnic Inst.*, 735 F.2d 38, 43 (2d Cir.1984); *Goff v. Continental Oil Co.*, 678 F.2d 593, 598 (5th Cir.1982); *Winston v. Lear–Siegler, Inc.*, 558 F.2d 1266, 1268 (6th Cir.1977).

In holding that retaliatory discharge is actionable under section 1981, the Fifth Circuit reasoned:

> The ability to seek enforcement and protection of one's right to be free of racial discrimination is an integral part of the right itself. A person who believes he has been discriminated against because of his race should not be deterred from attempting to vindicate his rights because he fears his employer will punish him for doing so. Were we to protect retaliatory conduct, we would in effect be discouraging the filing of meritorious civil rights suits and sanctioning further discrimination against those persons willing to risk their employer's vengeance by filing suits.

*Goff*, 678 F.2d at 598. The Second Circuit further reasoned that:

> an employee who is punished for seeking administrative or judicial relief ... has failed to secure that right to equal treatment which constitutes the fundamental promise of § 1981. When a complainant experiences retaliation for the assertion of a claim to even-handed treatment, he remains under a handicap not faced by his colleagues. Such inequality, we believe, is proscribed by § 1981.

*Choudhury*, 735 F.2d at 43.

Although it noted the "substantial body of court of appeals precedent ... that section

1981 forbids retaliation," *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1313 (7th Cir.1989), the Seventh Circuit never explicitly ruled on this issue. Concurring in *Malhotra*, Judge Cudahy wrote separately to address the issue of whether retaliation was actionable under section 1981. Judge Cudahy noted that "[a] prohibition against retaliation is a necessary adjunct to the anti-discriminatory provision itself. If an employee may be fired for complaining of discrimination, his right not to be discriminated against is surely vitiated." *Id.* at 1314 (Cudahy, J., concurring). Judge Cudahy further noted that:

> The recognition of a right of action for retaliation under section 1981 is simply another application of a straightforward syllogism: if an employee is granted certain substantive rights against his or her employer, the employer may not punish the employee's assertion of those rights, since this would allow the employer to take away a right to protection conferred by statute.

*Id.* at 1315. This court wholly agrees with the foregoing reasoning and similarly finds retaliatory conduct actionable under section 1981.[1]

 2. Plaintiff's claim of retaliatory discharge under 42 U.S.C. § 1981 may proceed either by way of the "mixed-motives" analysis announced in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) or via the approach earlier established in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and reconfirmed in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).[2] *Price Waterhouse* applies where *both* discriminatory and non-discriminatory considerations influenced an employer in making an adverse employment decision, while the *McDonnell Douglas–Burdine* sequence is used where "*either* a legitimate *or* an illegitimate set of considerations led to the challenged decision." *Price Waterhouse*, 490 U.S. at 247, 109 S.Ct. at 1788. Plaintiff's burden is to show by a preponderance of the evidence that retaliatory considerations were a "substantial factor" in the complained-of adverse employment decision. *Id.* at 259, 265, 109 S.Ct. at 1795, 1798 (concurring opinions of White and O'Connor, JJ.). Under the *McDonnell Douglas–Burdine* analysis the plaintiff must show that:

(1) she engaged in statutorily protected expression;

(2) she suffered an adverse action by her employer; and

(3) there is a causal link between the protected expression and the adverse action.

*Brenner v. Brown*, 36 F.3d 18, 19 (7th Cir. 1994), citing *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992).

3. In this case, Ms. Wilborn suffered an adverse employment decision less than 10 days after she informed Primary Care that she intended to file a discrimination suit. In *Holland*, the court acknowledged that "a 'telling' temporal sequence demonstrates [the

---

**1.** We are aware that in *Buddingh v. South Chicago Cable, Inc.*, 830 F.Supp. 437 (N.D.Ill.1993), the court held that a claim of retaliatory discharge resulting from the plaintiff's filing of a race discrimination complaint with the EEOC failed to state a claim under section 1981. The *Buddingh* court found that "plaintiff does not allege that defendants retaliated against her for any attempt to enforce contract rights, even as that term is broadly defined under the Civil Rights Act of 1991." *Id.* at 442. Nonetheless, we find the reasoning articulated in the pre-*Patterson* circuit court decisions, as well as by the concurrence in *Malhotra*, to be compelling. Accordingly, we respectfully decline to follow *Buddingh*. The court further notes that in *Garcia v. Rush–Presbyterian St. Luke's Med. Ctr.*, 80 F.R.D. 254, 265–66 (N.D.Ill.1978), a pre-*Patter-son* opinion from this district, the court held that allegations of race-based retaliatory discharge did state a cause of action under section 1981. *See also, Adams v. City of Chicago*, 865 F.Supp. 445, 446–447 (N.D.Ill.1994) (rejecting *Buddingh's* analysis).

**2.** The *McDonnell Douglas* shifting-burden framework for proving intentional discrimination in employment under Title VII applies equally to actions brought under section 1981. *Von Zuckerstein v. Argonne Nat'l Laboratories*, 984 F.2d 1467, 1472 (7th Cir.1993); *see also Malone v. Signal Processing Technologies, Inc.*, 826 F.Supp. 370, 374 (D.Colo.1993) (using *McDonnell Douglas* framework to determine sufficiency of a § 1981 retaliation claim).

necessary] causal link." *Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307, 1315 (7th Cir.1989). This Court finds that plaintiff has established the necessary causal link by both the close temporal sequence between her exercise of protected activity and Primary Care's adverse action *as well as* the defendants' own documents in this case. The defendants' own "counseling documents" with respect to Ms. Wilborn continually, consistently and unnecessarily refer to plaintiff's contemplated employment discrimination suit. (Plaintiff's Ex. D; Defendants' Exs. 8 & 9). These documents also fully corroborate Ms. Wilborn's testimony.

4. In employment discrimination cases it is only "the perception of the decision maker which is relevant" in determining the motivation for an adverse employment action. *Karazanos v. Navistar Int'l. Transp. Corp.*, 948 F.2d 332, 337–38 (7th Cir.1991). Here there is no question that the relevant decision-maker, Dr. Tetik, was aware of the fact that Ms. Wilborn had decided to file an employment discrimination suit against Primary Care and thereafter participated in the decision to terminate Ms. Wilborn. Ms. Waxstein's memorandum which related to the decision to terminate Ms. Wilborn is the classical "smoking-gun" evidence in this case. (Defendants' Exhibit 8). This memorandum stated that Ms. Wilborn had "told at least two staff members that she planned to file a discrimination suit against the company, causing even further disruption and apprehension at the Clinic." (*Id.*). The very next sentence of this document, which was handwritten, continues "[d]ue to the severity of the above and [Ms. Wilborn's] unwillingness and inability to help us to solve these problems, Sandra is to be terminated immediately due to dishonesty, revealing confidential information to staff members and further disrupting and demotivating the staff." (*Id.*). This document alone shows that Ms. Wilborn's plan to file an employment discrimination lawsuit was a "substantial factor" in the decision to terminate her.

5. After weighing all of the trial evidence presented, this Court concludes that Primary Care and Dr. Tetik have not shown as a matter of law that they would have made the same decision to terminate Ms. Wilborn even if they had not taken her contemplated lawsuit into account. *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. at 1794.

Primary Care's records indicate that Ms. Wilborn was fired, in part, for dishonesty. Yet Ms. Wilborn was rehired by Primary Care within four months. This Court does not believe that an employee who was truly fired for dishonesty would be rehired within four months. During the trial Dr. Tetik indicated that he terminated Ms. Wilborn because of her failure to have an effective "interpersonal relationship" with Ms. Rose and Dr. Knapp. While this somewhat belated justification, which is not fully consistent with defendants' employment documents, carries more weight, it does not in any way change the Court's conclusion that Ms. Wilborn's plan to file an employment discrimination lawsuit was a "substantial factor" in the decision to terminate her. For the foregoing reasons the Court finds that Wilborn has established that her termination was retaliatory.

6. Plaintiff has further demonstrated that she was a victim of intentional discrimination, in violation of 42 U.S.C. § 1981, because she has shown that she was treated differently than a similarly situated non-minority employee—Ms. Karen Rose. There is no question that Ms. Rose was never subjected to any disciplinary actions for her involvement in the January 3, 1992 incident even though her actions were similar or worse than those of the plaintiff. Furthermore, unlike plaintiff, Ms. Rose had previously been disciplined in November for inappropriate management behavior. The defendants' more favorable treatment of Ms. Rose supports the Court's conclusion that defendants' proffered reasons for plaintiff's dismissal were pretextual.

7. Defendant Rose was never served in this matter and is hereby dismissed.

9. Defendants' dismissal of plaintiff also violated her termination rights under her employment contract. (Plaintiff's Ex. A).

10. Plaintiff's loss of salary for the months between her January 20, 1992 termination and her reemployment offer in May

1992 totals $10,769.23. These damages include the damages plaintiff incurred as a result of defendants' breach of employment contract, which would have allowed for compensation for an additional thirty (30) days for immediate termination without cause or notice. Also the Court refuses to read-in this provision to apply to the plaintiff's reemployment by the defendants in June of 1992.

11. After evaluating the appropriate factors in *Yarbrough v. Tower Oldsmobile Inc.,* 789 F.2d 508 (7th Cir.1986), this Court has determined that this is not a case which justifies the imposition of punitive damages against the defendants.

### CONCLUSION

For all of the foregoing reasons, judgment is hereby entered in favor of plaintiff on Counts I and II of her Amended Complaint in the amount of $10,769.23. Plaintiff is also entitled to an award of reasonable attorney's fees as a prevailing party under 42 U.S.C. § 1988. This Court directs the parties to confer on the issue of reasonable attorney's fees to determine if this issue can be settled. If this matter can not be settled, the plaintiff shall file a formal request for attorney's fees by October 14, 1994. Any objections shall be filed by October 28, 1994. Plaintiff's reply, if any, due by November 4, 1994.